

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO. FSD 133 OF 2024 (IKJ)

B E T W E E N:

1. CANTERBURY SECURITIES, LTD. (IN OFFICIAL LIQUIDATION)

2. KAREN SCOTT AS JOINT OFFICIAL LIQUIDATOR OF CANTERBURY SECURITIES, LTD

3. RUSSELL HOMER AS JOINT OFFICIAL LIQUIDATOR OF CANTERBURY SECURITIES, LTD

<u>Plaintiffs</u>

- and -

(1) ERIN WINCZURA
(2) PFS LTD
(3) CANTERBURY GROUP

<u>Defendants</u>

**IN CHAMBERS**

| | |
|---|---|
| **Before:** | The Hon. Justice Kawaley |
| **Appearances:** | Mr Tom Lowe KC of counsel with Mr John Harris of Nelsons, for the Applicants/Plaintiffs |
| **Heard:** | 24 April 2024 |
| **Date of decision:** | 24 April 2024 |
| **Draft Judgment Circulated:** | 29 May 2024 |
| **Judgment Delivered:** | 4 June 2024 |

*240604- Canterbury Securities, Ltd v Erin Winczura & Ors. FSD 133 of 2024 (IKJ) - Reasons for Decision*

*Injunctions-ex parte application for freezing order-claims for breach of fiduciary duty, wrongful dissipation of assets, unlawful means conspiracy and fraudulent trading-Companies Act (2023 Revision), section 147*

**REASONS FOR DECISION**

**Background**

1. By an *Ex Parte* Summons dated 23 April 2024, supported by the First Affidavit of Karen Scott ("Scott 1"), the Applicants (now Plaintiffs herein) applied for an 'Injunction Prohibiting Disposal of Assets'. The present action application was contemplated but had not yet been formally commenced when the Summons was heard on 24 April 2024.

2. For completeness I should mention that paragraph 2 of the 23 April 2024 *Ex Parte* Summons sought permission to serve the proposed Writ on Mr Eric Miller, a former director of the Company, out of the jurisdiction pursuant to Grand Court Rules ("GCR") Order 11 rule 1 (1) (c) and 1 (1) (ff). In the course of the hearing on 24 April 2024, I indicated my provisional view that I was unwilling to grant that application because there was insufficient evidence before the Court about his involvement in the relevant events to enable me to conclude that there was a serious issue to be tried on the merits of the claims it was proposed to pursue against him.

3. As I recall, Mr Lowe KC indicated that this application as against Mr Miller (and, consequentially, the Injunction application as well) would not be pursued. The Generally Indorsed Writ of Summons herein was issued on 25 April 2024. Mr Miller was not named as a Defendant.

4. On 24 April 2024, at the conclusion of the *ex parte* hearing, I orally granted the Injunction sought in terms which were not perfected until 26 April 2024 ("Freezing Order") against the 1st Defendant ("EW") and the two corporate Defendants. The Freezing Order most significantly (under the heading "*DISPOSAL OF ASSETS*") restrained each Respondent from disposing of any assets up to the value of US$ 30 million and specified one piece of real property in the Cayman Islands in the case of the 1st Respondent.

5. These are the short reasons I promised to give for my decision to grant the Freezing Order.

**Governing legal principles**

6.  Although the law was dealt with summarily in oral argument, a bundle of Authorities was provided to the Court in advance of the hearing. The relevant principles governing applications for interim freezing orders are most clearly summarised in *Ovaskainen-v-Ovaskeinen*, FSD 138/2023 (MRHCJ), Judgment dated 21 June 2023. Ramsay-Hale CJ opined as follows:

> "16. Section 11 of the Grand Court Act provides that,
>
>> '(1) The Court shall be a superior court of record and, in addition to any jurisdiction heretofore exercised by the Court or conferred by this or any other law for the time being in force in the Islands, shall possess and exercise, subject to this and any other law, the like jurisdiction within the Islands which is vested in or capable of being exercised in England by
>>
>> (a) Her Majesty's High Court of Justice; and
>>
>> (b) the Divisional Courts of that Court, as constituted by the Senior Courts Act, 1981, and any Act of the Parliament of the United Kingdom amending or replacing that Act…'
>
> 17. Section 37 of the English Senior Courts Act 1981 relevantly provides that,
>
>> '(1) The High Court may by order (whether interlocutory or final) grant an injunction or appoint a receiver in all cases in which it appears to the court to be just and convenient to do so.'
>
> 18. W's application was for interim relief ancillary to the Writ, seeking to restrain H, a party to the proceedings, from removing or otherwise dealing with assets within the jurisdiction of the Court, if the Court were satisfied it was just and convenient to grant it.
>
> 19. In the recent judgment of the Privy Council in Broad Idea International Ltd (Respondent) v Convoy Collateral Ltd, [2021] UKPC 24, an appeal from the British Virgin Islands, Lord Leggatt set out the current practice for granting a freezing injunction at [101] summarized as follows:
>
>> (1) A good arguable case for the payment of a sum of money that will be enforceable through the process of the court;
>>
>> (2) The existence of assets belonging to or under the control of the defendant against which judgment could be enforced; and
>>
>> (3) A real risk that the defendant will dissipate those assets and the judgment will be left unsatisfied if the order is not given.
>
> 20. The authorities are clear that there must be cogent evidence to show that there is a risk of dissipation. As it was put by Doyle J in Trezevant v Trezevant (Unrep)10 November 2021

at [19] and [20] adopting the comments of Chadwick P in *AHAB v Saad Investments Company Limited* 2011 (1) CILR 178 at [69], the applicant must provide,

> "'solid evidence" to the effect that, without such relief, there was a real risk that the judgment would not be satisfied by some process of enforcement" noting that "…in appropriate cases it is possible to infer the risk from evidence of surrounding circumstances.'"

7. In summary, the Applicants needed to establish:

    (a) a good arguable case on the merits of their claims;

    (b) that the Respondents likely had assets against which a judgment could be enforced; and

    (c) cogent evidence of a real risk of dissipation unless the Respondents were restrained.

**The Applicants' case**

8. The Applicants are the Joint Official Liquidators ("JOLs") of Canterbury Securities Ltd (in Official Liquidation) (the "Company") and the Company itself. EW was the former chief Executive Officer and majority shareholder of the two corporate Respondents, PFS Ltd ("PFS") and Canterbury Group ("CG"). The claims sounding in damages were summarized in paragraphs 37 of Scott 1 and can be further summarised as follows:

    (a) EW caused the Company to breach its contractual duties to Fortunate Drift Limited ("FDL", on whose Petition the Company was wound-up) and to dissipate the proceeds of sale of the YRIV shares and was accordingly liable for breach of fiduciary duty;

    (b) EW misappropriated funds belonging to the Company and/or held on trust by the Company;

    (c) EW, CG and PFS were knowingly party to the Company carrying on business with intent to defraud its creditors contrary to section 147 of the Companies Act (2023 Revision).

9. The context for these claims primarily arises out of the commercial interactions between FDL, the Company and PFS in 2018 which resulted in FSD 227/2018 (the "FDL Proceedings"). These claims are to a material extent grounded in the fact that this Court has already found that the Company breached its fiduciary duty to FDL by, *inter alia*, failing to return YRIV shares the Company agreed to hold for FDL and found that the Company owes FDL approximately US$18 million. After the JOLs' appointment, and contrary to numerous sworn averments by EW that the Company had

retained sufficient assets to meet any judgment that might be entered against it, the JOLs discovered that the Company's cupboard, like Old Mother Hubbard's, was bare.

10. EW had not cooperated to any meaningful extent with the JOLs' attempts to locate assets which ought to be held by or for the benefit of the Company. However, it appeared that the proceeds of the sale of the YRIV shares in relation to which FDL was found by the Court to have a proprietary claim have been dissipated, seemingly with the involvement of CG. Scott 1 said little explicitly about the role of PFS, perhaps because due deference was being given to the fact that the relationship between FDL and PFS is under consideration of the Nevada Proceeding. Taking judicial notice of matters of record in the FDL Proceedings, a plausible basis for inferring that PFS was implicated in the alleged misconduct under the direction of EW could be found without the need for explicit analysis.

11. One jaw-dropping bit of evidence was placed before the Court, although I was rightly cautioned not to place too much reliance on it because of its provenance. The Company under EW's control in the FDL Proceedings had sought to reassure the Court that the proceeds of sale of the YRIV shares were safely under the Company's control by producing a Confirmation Letter from Canadian Escrow Company Ltd ("Canadian Escrow") dated 12 April 2023 asserting that Canadian Escrow was holding "*in trust cash equivalent US$15,500,000 value, in the name of Canterbury Securities Ltd*". The purported signatory of the Confirmation Letter had when contacted by the JOLs:

   (a) denied signing or issuing that letter and asserted that it is not even printed on that Company's letterhead; and

   (b) denied having any dealings with EW or the Company.

12. The Confirmation Letter had, curiously, been placed before the Court not by EW herself, but exhibited to an Affidavit sworn by her Kenya-based Personal Assistant. EW had thereafter been ordered to provide a screenshot of the account as further confirmation that the funds existed, which EW was not able to produce. In the 14 September 2023 Reasons for Decision in the FDL Proceedings, it was made clear that that the Court had arrived at no conclusions about Canadian Escrow's reported position in relation to the Company. Instead the Court felt bound to assume that the funds said by EW to be there were not in fact there:

   "*21. In these circumstances (which I elaborate upon further below), the Court could only properly proceed on the assumption that Canadian Escrow Ltd does not in fact hold the funds the Defendant contended the escrow agent holds for its sole benefit. This was on the simple basis that the Court has sought verification of the existence of the relevant funds through granting paragraph 1.2 of the Information Order which the Defendant has for*

> *whatever reasons failed to provide. Verification was sought because the Court determined that verification was required…"*

13. In 2022 the "Black Gold" proceedings were issued against, *inter alia*, the Company and CG seeking relief for the diversion of funds that group of investors placed with the Company. The JOLs' analysis was accordingly not an exclusively 'FDL-centric' one. It was also clear that there was a close connection between the substantive claims asserted, broadly alleging the misappropriation of funds, and the grounds for asserting that a serious risk of further dissipation existed.

**Good arguable case on the merits**

14. The Applicants had clearly established a good arguable case on the merits of at least one of their proposed claims, claims which were based to an unusual extent on a combination of judicial findings in the FDL Proceedings and the investigations of officers of the Court carried out in the Company's liquidation in FSD 364/2023.

**Assets against which a judgment could be enforced**

15. This limb of the freezing injunction test was the least straightforward viewed through a traditional lens. As regards EW, a specific real property asset was identified. As regards CG and PFS, the evidence suggested no liquid assets had been found. It did not suggest that no assets might be found and that freezing relief would be futile. Indeed, the proposed form of Order included disclosure obligations. This second requirement was clearly met as regards EW and satisfactorily met in all the circumstances of the present case.

**Risk of dissipation**

16. There was cogent evidence of a risk of dissipation on the part of EW and companies she controlled. This risk was demonstrated by reference to the fact that more than $15 million which should have been in the Company's coffers when the JOLs were initially appointed as joint provisional liquidators in December 2023 was missing and had not yet been found.

**Full and frank disclosure**

17. Mr Lowe KC in the Applicants' Skeleton Argument drew the following matters to the attention of the Court:

*240604- Canterbury Securities, Ltd v Erin Winczura & Ors. FSD 133 of 2024 (IKJ) - Reasons for Decision*

  (a) what Canadian Escrow had recently said might not be reliable (it appeared to me to be more likely reliable than unreliable);

  (b) certain assertions about the tracing of assets set out in paragraph 42.4 and 42.5 of Scott 1 were based on inference rather than hard evidence (the inference appeared to be a reasonable one for the purposes of the present interlocutory application);

  (c) EW claimed to have been abroad since December 2023 and indicated she would meet the JOLs on 7 May 2024 (this did not to my mind justify what appeared to be a substantial failure to assist the JOLs to identify the missing funds);

  (d) There was a stronger case against CGL. The case about PFS was not supported by any direct evidence. It was based on an inference from its involvement in the transaction in relation to which the fraud was perpetrated. EW contends that PFS is a legitimate business with a substantial claim against FDL. (I considered this was insufficient to bring the claim against PFS below the "good arguable case" threshold).

**Conclusion**

18. For the above reasons on 24 April 2024, I granted the Freezing Order.

_____
**THE HONOURABLE JUSTICE IAN RC KAWALEY**
**JUDGE OF THE GRAND COURT**