Alex Lipman, Esq.
**LIPMAN LAW PLLC**
147 West 25th Street, 12th Floor
New York, New York 10001
Telephone: (212) 401-0070
Email: alexlipman@lipmanpllc.com

*Attorneys for interested party,*
*Ms. Erin Winczura*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------)
In re:                                                    )
                                                          )
                                                          )          Chapter 15
CANTERBURY SECURITIES, LTD.,            )          Case No.: 24-11814 (DSJ)
                                                          )
                                                          )
Debtor in a Foreign Proceeding.            )
----------------------------------------------------------)

**MOTION TO DISMISS CHAPTER 15 PROCEEDING OR, IN THE ALTERNATIVE,**
**TO TERMINATE RELIEF GRANTED TO FOREIGN REPRESENTATIVES**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................1

II.   BACKGROUND ...............................................................................9

      A.    The Foreign Representative's Efforts Stem from the Underlying Two-Party
            Dispute Between Canterbury and FDL. ................................................ 9

      B.    Appointment of the Foreign Representatives as Liquidators of Canterbury. ....... 14

      C.    The Foreign Representatives' Cayman Islands Action Against the Non-Debtors.
            ....................................................................................... 15

III.  LEGAL STANDARD ......................................................................18

IV.   ARGUMENT.................................................................................19

      A.    The Cayman Islands Punitive Involuntary Liquidation of Canterbury Should Not
            be Recognized. ........................................................................ 20

      B.    This Chapter 15 Case Should Be Dismissed Because the Underlying Judgment
            Was Obtained by Fraud on the Foreign Court. ....................................... 23

      C.    This Chapter 15 Case Should Be Dismissed Because the Foreign Representatives
            Are Here Before this Court Pursuing the Profits from a Securities Fraud Scheme.
            ....................................................................................... 30

      D.    Following a Fraud Referral by FINRA, Nasdaq Delisted YRIV. ................... 32

      E.    As FINRA Had Found, Mr. Sin, Mr. Coleman and Others Affiliated with FDL
            and YRIV Took Steps to Artificially Prop Up the Trading Price of YRIV Stock. 34

      F.    In Addition to Market Manipulation, the Evidence Shows that YRIV Used FDL to
            Sell Unregistered YRIV Securities in Violation of Section 5 of the Securities Act
            of 1933. ............................................................................... 42

      G.    The Cayman Islands Findings of Fiduciary Duty and its Breach Were Based on
            Testimony Shown to be False. ........................................................ 46

      H.    The Cayman Islands Court's Measure for Breach of Contract Damages, and for
            Default Damages Against Non-Debtors, was Unfounded and Uninformed. ........ 49

V.    CONCLUSION ..............................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Atlas Shipping A/S,*
    404 B.R. 726 (Bankr. SDNY 2009) .......................................................18

*In re Basis Yield Alpha Fund (Master),*
    381 B.R. 37 (Bankr. SDNY 2008) ....................................................7, 18

*In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,*
    389 B.R. 325 (SDNY 2008) .................................................................18

*In re British Am. Isle of Venice (BVI), Ltd.,*
    441 B.R. 713 (Bankr. S.D. Fla. 2010) ................................................18

*In re E.S. Prof'l Servs., Inc.,*
    335 B.R. 221 (Bankr. S.D. Fla. 2005) ................................................21

*In re Ernst & Young, Inc.,*
    383 B.R. 773 (Bankr. D. Colo. 2008) .................................................18

*Higgins v. Vortex Fishing Systems, Inc.,*
    379 F.3d 701 (9th Cir. 2004) .............................................................21

*In re Iida,*
    377 B.R. 243 (9th Cir. BAP 2007) .....................................................18

*Jaffe v Samsung,*
    737 F. 3d 14 (4th Cir. 2013) ..............................................................19

*In re Murrin,*
    477 B.R. 99 (D. Minn. 2012) ..........................................................6, 21

*SEC v. Elmas Trading Corporation,*
    620 F.Supp. 231 (D. Nev. 1985), *aff'd,* 805 F.2d 1039 (9th Cir. 1986) ................................20

*SEC v. Kern,*
    425 F.3d 143 (2d Cir. 2005) ..............................................................43

*In re Sivec SRL,*
    476 B.R. 310 (Bankr. ED Okla. 2012) ..............................................19

*In re Tichy Elec. Co. Inc.,*
    332 B.R. 364 (Bankr. N.D. Iowa 2005) .............................................21

*In re Toft*,
    453 B.R. 186 (Bankr. S.D.N.Y. 2011) ...................................................................................19

## **Statutes**

11 U.S.C. § 303(e) .........................................................................................................................22

11 U.S.C. § 303(h)(1) ...............................................................................................................6, 22

11 U.S.C. § 1506 ....................................................................................................................*passim*

15 U.S.C. 77b(a)(11) .....................................................................................................................44

15 U.S.C § 77d(1) ..........................................................................................................................43

15 U.S.C. § 230.144(b) ..................................................................................................................43

18 U.S.C. §§ 1956, 1957 .................................................................................................................2

Bankruptcy Code Chapter 15 ...................................................................................................*passim*

Securities Act of 1933 Section 5 ........................................................................................41, 43, 44

Securities Act of 1933 Section 5 and Section 17(a) (15 U.S.C §§ 77e, 77q(a)) ............................1

Securities Act Section 4(1) ............................................................................................................43

Securities Act Section 5, 15 U.S.C § 77e ......................................................................................46

Securities Act Section 5 .................................................................................................................50

Securities Exchange Act of 1934 Section 10(b) (15 U.S.C. § 77j(b)) ............................................1

## **Rules**

17 CFR 240.10b-5..............................................................................................................................1

17 CFR § 230.144(a)(1)..................................................................................................................44

17 CFR § 230.144(b)(2)..................................................................................................................45

17 CFR § 230.144(e)........................................................................................................................45

17 CFR § 230.144(h)(1)..................................................................................................................45

Ms. Erin Winczura (Ms. Winczura or the "Movant"), who is subject to a freezing order granted to the Foreign Representatives in this case and who is the owner of the parent company of the debtor, Canterbury Securities, Ltd. ("Canterbury" or the "Debtor"), seeks dismissal of this Chapter 15 proceeding pursuant to 11 U.S.C. § 1506, or in the alternative, the termination of the related relief granted to the Foreign Representatives. And, pending resolution of this motion, for the reasons set out below, the Court should stay the effect of the freezing order approved by the Court alongside the recognition order; and should stay compliance with the subpoenas the Court authorized by approving the Foreign Representatives' request for non-automatic, related relief.

## I.    <u>PRELIMINARY STATEMENT</u>

Section 1506 provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." As detailed below with specific evidence and references to the relevant judicial findings in the Cayman Islands, which is the relevant jurisdiction here, it is hard to fathom a more appropriate case for refusing recognition than this one.[1]

The Foreign Representatives are essentially acting on behalf and at the behest of fraudsters who committed a multimillion-dollar securities fraud—by means of selling (or causing others to sell) unregistered, restricted securities at artificially inflated prices on Nasdaq in violation of Section 5 and Section 17(a) of the Securities Act of 1933 (15 U.S.C §§ 77e, 77q(a)); as well as Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 77j(b)), and Rule 10b-5 thereunder (17 CFR 240.10b-5). In effect, the Foreign Representatives are now assisting the

---

[1] The Movant has consulted the Court's individual rules relating to the length of briefs and respectfully asks for permission to exceed the page limit. This is necessary to explain adequately the Movant's bases for this motion and to present and elucidate the specific evidence needed to support this motion.

perpetrators—and now have invited this Court to assist the perpetrators—to complete the last step of their frauds: to realize the proceeds from their illegal stock sales.  Worse still, the Foreign Representatives do not even know the true identities of the people for whom they are acting, meaning that if they were to collect the sums they are seeking, they would be delivering fraud proceeds to people who have hidden their identities.  This would constitute financial transactions in fraud proceeds in violation of the relevant anti-money-laundering laws and regulations.  *See e.g.*, 18 U.S.C. §§ 1956, 1957.

In addition, the Foreign Representatives now know—based on evidence that became available after the Cayman Islands judgments that gave rise to their efforts—that these Cayman Islands judgments were obtained by fraud.  Ignoring all that, they failed to appeal the fraudulently obtained judgments and chose instead to come after the victims of the fraudsters on whose behalf they are gathering assets.  Put succinctly, continued recognition here would perpetuate a process designed to help fraudsters to profit from their fraud based on a fraudulently obtained judgment against the Debtor.  That would be manifestly contrary to the public policy of the United States to maintain the integrity of its capital markets, protect U.S. investors, and prevent transactions in proceeds of illegal activity; the United States, in other words, has a very strong interest in making sure that continuing violations of its securities laws are impeded and not made profitable, and that its anti-money-laundering laws are heeded.

The dispute that eventually led to these proceedings arose from Canterbury's liquidation on the 6th and 7th of December 2018 of shares of a China-based (Nevada incorporated) company, Yangtze River Port and Logistics Ltd. ("YRIV"), that it held as collateral in a brokerage account in the name of a British Virgin Islands company, Fortunate Drift, Ltd. ("FDL").  These YRIV shares in FDL's brokerage account with Canterbury were pledged by FDL as security to another

company owned by the Movant, PFS, Ltd. ("PFS").  In a related transaction in August 2018, FDL induced PFS to pay US $10 million to buy 1,144,584 YRIV shares from FDL along with a put option that allowed PFS to sell an equal number of YRIV shares to FDL at a predetermined price of $11.26 per share during a predetermined time window (the "Put Option").  The YRIV shares liquidated by Canterbury were pledged as collateral by FDL as part of the same August 2018 transaction to ensure FDL would honor the Put Option in the event it was exercised by PFS.

Unbeknownst to Canterbury and PFS at the time, FDL, acting in concert with YRIV (and as its affiliate and instrumentality) engaged in a scheme to inflate fraudulently YRIV's stock price. On December 6, 2018, *Hindenburg Research* published a report exposing YRIV as a sham company and offering evidence that the value of YRIV's shares was artificially inflated and that YRIV was, essentially, a pump-and-dump operation (the "Hindenburg Report").[2]  In response, the YRIV stock price began to collapse; it is now at zero, and YRIV has been delisted.  Canterbury sold a portion of the collateral to preserve value to cover the Put Option sold by FDL to PFS.  The essence of FDL's claim against Canterbury is that, despite the market reaction to the Hindenburg Report, Canterbury had no right to sell the shares FDL posted as collateral and that FDL was damaged thereby.  As set forth more fully below, the Hindenburg Report was eventually corroborated by, *inter alia,* FINRA market-manipulation findings, the Nasdaq Regulation Staff market manipulation findings, the delisting of the YRIV securities by Nasdaq when the Nasdaq Regulation Staff findings were unsuccessfully appealed to the Nasdaq Hearings Panel by YRIV, and through other evidence given by the parties in litigation.

---

[2] *See Yantze River Port & Logistics:  Total Zero. On-the-Ground Research Shows Assets Appear to be Largely Fabricated*, Hindenburg Research, Dec. 6, 2018, available at: https://hindenburgresearch.com/yangtze-river-port-logistics-total-zero-on-the-ground-research-shows-assets-appear-to-be-largely-fabricated.

Despite being presented with evidence of securities fraud by FDL and YRIV—and despite initially specifically finding that FDL had violated anti-money laundering ("AML") regulations and submitted false testimony as wells as forged and backdated documents to the Cayman Islands court concerning FDL's beneficial ownership—the Cayman Islands court misunderstood, ignored, and discounted the evidence of FDL's securities fraud. In an interlocutory decision of August 17, 2023, the Cayman Islands court found Canterbury liable to FDL on a subset of FDL's claims.

After the Cayman Islands court rendered that interlocutory liability judgment, FDL's witnesses, in a separate but related, two-party dispute in state court in Nevada (between FDL and PFS), gave evidence showing that the Cayman Islands liability judgment had been obtained by fraud on the Cayman Islands court. For example, on one critical claim, the Cayman Islands court found Canterbury liable for breach of fiduciary duty because the court accepted FDL's assertion that Canterbury had not disclosed its relationship with PFS. But, unbeknownst to the Cayman Islands court, in the subsequent proceedings in Nevada, FDL's witness admitted FDL was aware of a relationship between Canterbury and PFS and the relevant facts, at the relevant times. As to other critical claims, the Cayman Islands court rejected Canterbury's fraudulent inducement and unclean hands defenses to FDL's breach of contract and unjust enrichment claims by excusing as irrelevant what the court understood and acknowledged to be FDL's lies *to the court* about FDL's ultimate beneficial owner ("UBO"); the judge simply *assumed* (without evidence) that the person who was identified on the brokerage agreement with Canterbury as FDL's UBO was indeed its UBO during the relevant times. Again, unbeknownst to the Cayman Islands court, in Nevada, FDL's witness admitted that the person who was identified as FDL's UBO in the brokerage agreement *was actually dead* before the relevant transactions took place, and that his signature on

4

critical documents was forged, meaning that the lies that the Cayman Islands court dismissed as irrelevant were anything but.

The evidence adduced in the Nevada litigation proving that FDL had committed fraud on the Cayman Islands court, coupled with obvious other facial problems with the Cayman Islands liability judgment in favor of FDL, gave Canterbury overwhelming grounds to reverse that judgment on appeal. But Canterbury did not have the opportunity to show the Cayman Islands court how it was defrauded or to appeal from the liability judgment. Instead, FDL succeeded in persuading the Cayman Islands court to place Canterbury into an involuntary insolvency and to appoint the Foreign Representatives as its liquidators. The Foreign Representatives—the specific individuals were proposed by FDL—then chose not to pursue an appeal on behalf of Canterbury.

The Cayman Islands judicial order involuntarily liquidating Canterbury was not made because Canterbury was insolvent. It was instead ordered as a punitive sanction for a purported failure to comply with disclosure orders during the litigation of the two-party dispute between Canterbury and FDL. The Foreign Representatives were appointed provisional liquidators on December 13, 2013, and then official liquidators on January 16, 2024, after the Cayman Islands court had entered the interlocutory finding of liability against Canterbury, but before the Cayman Islands court issued its final judgment, capable of appeal, on January 31, 2024. The Foreign Representatives elected not to appeal from the liability judgment or to seek to correct it. Instead, despite knowledge of the forgeries and false testimony given in the Cayman Islands proceeding and knowledge of the contradictory testimony given by FDL's witness in the December 2023 trial in Nevada that supported Canterbury's defenses—and presumably with ongoing funding from FDL derived from the illegal sale of YRIV stock—the Foreign Representatives decided single-mindedly to advance the interests of FDL to realize further proceeds from the YRIV stock fraud.

To that end, the Foreign Representatives brought a new separate adversary case in the Cayman Islands in the name of the Debtor (in involuntary liquidation) against three defendants: (i) Ms. Winczura (the Movant), (ii) the parent of the Debtor, Canterbury Group, Ltd. ("Canterbury Group") and (iii) PFS. In that case, and as another punitive sanction ordered by the Cayman Islands court *against Ms. Winczura* (and completely disregarding the separate corporate personalities of the entities, simply because she owned Canterbury Group and PFS), the Foreign Representatives obtained a pre-judgment freezing order that prohibited those three defendants from using any of their assets (up to US $30 million) for any purpose (even to pay for their legal fees, and, in the case of Ms. Winczura, *even to pay for food and lodging*). ECF No. 2-3. Note that corporates cannot appear in Cayman Islands courts without counsel.

Then, having already rendered them effectively defenseless through the freezing order, the Foreign Representatives obtained yet another punitive sanctions order from the Cayman Islands court specifically barring the non-debtor defendants from defending or making any submissions in that case. ECF No. 2-7. Consequently, the Foreign Representatives then obtained default judgments, one against Canterbury Group and PFS in June 2024 (ECF 2-5) and another against Ms. Winczura in September 2024 (ECF No. 2-6).

Based on those default judgments, the Foreign Representatives have also been appointed liquidators in the Cayman Islands for Canterbury Group and PFS. *See* ECF 2 ¶ 44. Unlike in the United States, where involuntary bankruptcy requires actual insolvency (*see* 11 U.S.C. § 303(h)(1)) and cannot be used as a forum for the trial and collection of an isolated disputed claim (*see, e.g.*, *In re Murrin*, 477 B.R. 99, 106 (D. Minn. 2012)), the proceedings in the Cayman Islands in this case offer an example of involuntary bankruptcy run amok in a two-party dispute.

The Foreign Representatives have now come before this Court ostensibly because they "need to obtain the books and records of the Debtor [and] to locate assets of the Debtor." ECF No. 2 ¶ 104.  But it is plain they have manufactured 'jurisdiction' by paying funds into a retainer with a New York lawyer for the Debtor (*see* ECF No. 2 ¶¶ 4, 48), and are instead attempting to use this Court and Chapter 15 to collect on the foreign judgments against the non-debtors, obtained in the circumstances described herein, for the benefit of FDL (whose true owners are undoubtedly unknown even to the Foreign Representatives) to cash in on the YRIV stock fraud perpetrated by FDL and its principals.  For example, from the subpoenas the Court has authorized them to serve, it is obvious the Foreign Representatives' objective is not to identify assets of the Debtor in the United States, but instead to obtain discovery in aid of execution of the Cayman Islands judgments obtained by default against the non-debtor Movant and the other non-debtors in that case.  *See, e.g.*, ECF No. 13-15 (exhibit to proposed subpoena to Bart Larsen, Esq., the Nevada lawyer for PFS). Respectfully, if the Foreign Representatives wish to obtain a new preliminary or permanent injunction against non-debtors, or to enforce in New York any purported Cayman Islands permanent injunction or Cayman Islands money judgments against non-debtors, or to seek discovery in aid of execution of foreign judgments against non-debtors, they should have to satisfy the requirements of New York law for injunctive relief and for the recognition of foreign judgments.[3]

In a similar vein, the Foreign Representatives sought and unfortunately have already obtained this Court's extension of what was only a pre-judgment freezing order and authorization

---

[3] Continued recognition would also approve a process that allows the perpetrators to evade the effects of a Nevada state court injunction currently in force against them.  *See infra* pp. 11, 49-50. It is fundamental to United States public policy that injunctions ordered by courts in the United States are enforced and not violated.

for the discovery they are pursuing.  But Chapter 15 of the Bankruptcy Code is not a "rubber stamp exercise."  *See, e.g.*, *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 40 (Bankr. SDNY 2008).  The Foreign Representatives are attempting to resurrect, make permanent, and enforce in the United States what was a *pre-judgment* Cayman Islands freezing order against the non-debtor defendants obtained in the Cayman Islands adversary case.  But the claims in that case have been reduced to judgment.  The Foreign Representatives do not point to any *permanent* injunction issued by the Cayman Islands court.  In fact, they acknowledge the freezing order was issued "as a pre-judgment freeze of assets under Cayman Islands law."  ECF No. 2 ¶ 93.  Then, without explanation or citation to any Cayman Islands authority, they simply assert that since the Cayman Islands court ultimately entered the default judgments, that the pre-judgment freezing order was somehow converted into a permanent injunction *sub silentio*.  *See id.*  But the opposite is naturally true.  The entry of the judgments extinguished the *pre-judgment*, interim freezing order.  Permanent injunctions are not made by implication.

For all these reasons, continued recognition would approve a process that deprived the Debtor (and non-debtors, including the Movant) of basic and fundamental due process safeguards.  The Court should not condone that process.  The Court is entitled to refuse continued recognition under 11 U.S.C. § 1506, and respectfully, should refuse to continue recognizing the foreign insolvency in this case.

This brief sets out a detailed account of the foreign and Nevada proceedings, and the stock fraud committed by YRIV and FDL.  To be absolutely clear, the Movant is not by this motion seeking to re-litigate the Cayman Islands judgments and orders, nor is she asking this Court for any affirmative relief against FDL or the Foreign Representatives.  Instead, prompted by the Court

for facts supporting some of the above assertions at the hearing on the Chapter 15 recognition, the Movant presents the facts.

Respectfully, the Court should dismiss this Chapter 15 case under the present circumstances as contrary to United States public policy. Alternatively, if recognition is sustained, the Movant respectfully requests the termination of the other relief granted to the Foreign Representatives. That relief includes the enforcement in the United States of the Cayman Islands freezing order against non-debtors, issued as a pre-judgment, interim measure in the Cayman Islands adversary case, and the third-party discovery targeting the assets and affairs of the non-debtors, including the Movant, Canterbury Group and PFS.

## II. **BACKGROUND**

### A. **The Foreign Representative's Efforts Stem from the Underlying Two-Party Dispute Between Canterbury and FDL.**

In the Spring of 2018, FDL opened a trading account at Canterbury and entered into a brokerage agreement (the "Brokerage Agreement") which identified its purported owner as someone by the name of a Mr. Chen Linyu ("Mr. Chen"). FDL funded that account with some YRIV shares and conducted some trading. Soon thereafter, FDL withdrew those YRIV shares from Canterbury. A Mr. Dominic Sin ("Mr. Sin") acted on behalf of FDL in opening the account. He was purportedly a director of FDL at that time.

Later, in August 2018, FDL entered into a stock purchase agreement with PFS (the "SPA"), by which PFS paid US $10 million to FDL to purchase 1,144,584 shares of common stock of YRIV as well as the Put Option (as noted, allowing PFS to sell an equal number of YRIV shares to FDL at a predetermined price of $11.26 per share during a predetermined time window). *See* March 27, 2019 Order Granting in Part and Denying in Part Pl.'s Mot. Prelim. Injunction, Eighth

Judicial District Court, Clark County Nevada, Case No. A-18-783981-C, a true and correct copy of which is appended hereto as **Exhibit 1**, at ¶ 1.

To secure the Put Option with PFS, FDL placed YRIV shares in the brokerage account with Canterbury.  FDL also executed a separate letter agreement dated August 16, 2018, by which it agreed to leave sufficient shares in FDL's brokerage account at Canterbury to cover PFS's Put Option, and FDL authorized Canterbury to liquidate these additional, collateral shares if FDL either did not have sufficient cash in the Canterbury collateral account or failed to timely satisfy its obligations to PFS under the Put Option.

On or about August 3, 2018, FDL transferred 6,000,000 YRIV shares to Canterbury by means of fraudulent documents, on which the signature of the dead purported owner of FDL was forged, but, nonetheless, was attested as true by the two individuals who interacted with PFS and Canterbury, Mr. Sin (the purported director of FDL) and Mr. James Coleman (who was a director of *YRIV* and *YRIV's* U.S. representative).   The SPA between FDL and PFS was signed on August 23, 2018.  As well as the Put Option, the SPA contained a representation by FDL that the relevant YRIV shares were freely tradable and unrestricted.  *See* SPA, dated as of August 16, 2018, and signed on August 23, 2018, a true and correct copy of which is appended hereto as **Exhibit 2**. As agreed, FDL left the remaining 4,855,416 shares (from the original 6,000,000 shares) with Canterbury as collateral to secure the Put Option (the "Collateral Shares").  *See* Exhibit 1 ¶¶ 2-3.

Almost immediately following the signing of the SPA, FDL raised a dispute with PFS concerning the exercise of the Put Option and the interpretation and enforcement of the agreements.  FDL claimed the Put Option was waived and began to demand the return of the Collateral Shares.  Following some lawyer correspondence, on November 5, 2018, PFS brought an action in the Eighth Judicial District Court, Clark County, Nevada (the "Nevada Court") against

FDL, asserting its security interest in the Collateral Shares and claiming FDL breached the agreements by attempting to remove the Collateral Shares from its account at Canterbury. *Id.* ¶¶ 4-5.  On November 13, 2018, the Nevada court entered a temporary restraining order enjoining FDL from withdrawing or transferring the Collateral Shares from its account at Canterbury (the "Nevada TRO").  *See id.* ¶ 6.

Following the release of the Hindenburg Report on the morning of December 6th, on December 6 and 7, 2018, to protect the value of the collateral that secured the Put Option, Canterbury liquidated 1,886,261 of the Collateral Shares for approximately US $19,959,397.18 (the "Proceeds").  ECF No. 2 ¶ 13.  In response to Canterbury's sale of Collateral Shares, and despite the quickly melting price of YRIV shares, on December 7, 2018, FDL ran into court in the Cayman Islands to ask the court to enjoin Canterbury from selling any more YRIV shares and to compel Canterbury to buy back the shares it had sold by that time.  The Cayman Islands court enjoined further selling.  Exhibit 1, at ¶ 8.  Only later, FDL followed up by bringing an action against Canterbury in the Cayman Islands for breach of fiduciary duty, breach of contract, and conversion.  FDL's fiduciary duty claim was based, *inter alia*, on its false assertion that it was unaware of Canterbury's relationship with PFS prior to entering into the SPA.

The release of the Hindenburg Report caused the YRIV share price to drop far below the Put Option exercise price of $11.26.  As a result, PFS fully exercised the Put Option.  FDL, however, refused to honor its obligations under the Put Option.  PFS then amended its complaint in the Nevada litigation to claim US $12,888,015.84 in proceeds it was entitled to receive from FDL under the Put Option and sought to recover those proceeds from the sale of the Collateral Shares.  *Id.* ¶ 11.  PFS moved the Nevada Court for a preliminary injunction, essentially to extend the terms of the Nevada TRO.  On March 27, 2019, the Nevada Court entered an order enjoining

FDL "from taking any action whatsoever to withdraw, transfer, or otherwise remove the [Collateral] Shares or the Proceeds from Canterbury unless expressly authorized to do so by further order of this Court or by written agreement with PFS." *Id.* ¶ 13 & p. 4 (the "Nevada Injunction"). Resolution of the Nevada litigation remains pending following a trial on the merits in December 2023, and the Nevada Injunction remains in force today.

Back on the Cayman Islands, in a preliminary skirmish, before reaching the merits of FDL's claims against Canterbury, Canterbury and FDL engaged in litigation over FDL's compliance (or non-compliance) with anti-money laundering requirements and concerning the true identities of FDL's beneficial owners. That dispute arose when Canterbury learned, after the transactions and execution of the agreements at issue, as well as the initiation of litigation in the Cayman Islands and in Nevada, that although FDL's account-opening documents identified Mr. Chen as FDL's ultimate beneficial owner ("UBO"), YRIV's filings had changed the name of FDL's UBO from Mr. Chen to a Mr. He Jeilin ("Mr. He").

This issue had implications for the validity of the Brokerage Agreement between FDL and Canterbury, because lying about the UBO of a trading account counterparty is a money laundering violation and would have been a material misrepresentation that, in turn, should have invalidated the Brokerage Agreement. Further, coupled with evidence of FDL's illegal market manipulation alongside YRIV, it should have disqualified FDL's equitable claims against Canterbury because of FDL's unclean hands.

After submissions and a hearing, the Cayman Islands court agreed that FDL lied and submitted false documents about its ownership. As a result, by order of April 15, 2020, and with Canterbury's informal agreement not to dissipate the Proceeds and remaining Collateral Shares, the Cayman Islands court lifted the restraining order as to the Proceeds that had been issued at the

onset of the case in December 2018.  *See* Cayman Islands Grand Court, Cause No: FSD 227 of 2018 (IKJ), Judgment of April 15, 2020, a true and correct copy of which is appended hereto as **Exhibit 3**.

At the trial on the merits that took place June 5-16, 2023, Canterbury additionally submitted evidence to the Cayman Islands court showing that FDL and others affiliated with YRIV were involved in illegal market manipulation, that FDL was used by YRIV and other conspirators to sell unregistered, restricted securities as part of the fraudulent scheme, and indeed, that FDL had fraudulently induced Canterbury to provide brokerage services and market access for FDL to borrow against and trade restricted, unregistered YRIV securities at inflated prices.  Canterbury offered evidence from a FINRA investigation and delisting of YRIV by Nasdaq, but the Cayman Islands court refused Canterbury's application to adduce expert evidence on market manipulation.  *See* Cayman Islands Grand Court, Cause No: FSD 227 of 2018 (IKJ), Order of June 30, 2023, a true and correct copy of which is appended hereto as **Exhibit 4**.  Instead, apparently ignorant of the fact that FINRA is the second-most authoritative securities regulator in the United States behind the U.S. Securities and Exchange Commission ("SEC"), the Cayman Islands judge showed this U.S. regulator no comity and dismissed and discounted FINRA's findings as hearsay and put the word "findings" in sceptical quotation marks.  *See* Cayman Islands Grand Court, Cause No: FSD 227 of 2018 (IKJ), Judgment of August 17, 2023, a true and correct copy of which is appended hereto as **Exhibit 5**, at ¶ 111.

As noted, after the conclusion of the trial on liability, the Cayman Islands court issued an interlocutory judgment, ruling in favor of FDL on its breach of fiduciary duty claim and making a conditional ruling on FDL's breach of contract claim, holding that it could prevail to one extent or another, subject to the validity of PFS's exercise of the Put Option (the issue to be separately

13

determined in the Nevada litigation).   The Cayman Islands court further adjourned for future determination: (a) FDL's conversion and unjust enrichment claims; (b) the permissible extent of Canterbury's counterclaim for an indemnity; and (c) the quantum of damages on FDL's breach of fiduciary duty claim.   *See* Exhibit 5 at ¶¶ 167-68; *see also* Cayman Islands Grand Court, Cause No: FSD 227 of 2018 (IKJ), Order of September 5, 2023, a true and correct copy of which is appended hereto as **Exhibit 6**.

Between the liability judgment of August 17, 2023 and the quantum hearing set for December 2023, FDL sought and obtained orders requiring Canterbury to disclose evidence of Canterbury's compliance with its informal agreement not to dissipate the Proceeds pending the conclusion of the Cayman Islands and Nevada litigations.   *See* ECF No. 2 ¶ 17(c).   Canterbury disclosed assets subject to the informal agreement: property held in a Canadian escrow (the "Canadian Escrow").   *See id.* ¶ 17(b).   On September 7, 2023, the Cayman Islands court ordered Canterbury to repatriate the Proceeds or otherwise fortify the informal agreement with assets situated in the Cayman Islands.   *Id.* ¶ 16.

On December 13, 2023, the Cayman Islands court found initial damages in favor of FDL in the amount of US $1,974,057.44 and made a further conditional ruling that FDL would be entitled to the Proceeds if the Nevada Court decided the Put Option was waived by PFS.   If the Nevada Court were to decide the Put Option was not waived, the Cayman Islands court instructed the parties "to apply for further relief."   *See* Cayman Islands Grand Court, Cause No: FSD 227 of 2018 (IKJ), Order of December 13, 2013 (filed Dec. 18, 2023), a true and correct copy of which is appended hereto as **Exhibit 7.**

**B.      Appointment of the Foreign Representatives as Liquidators of Canterbury.**

Prior to the quantum hearing (held on December 12-13, 2023), on December 1, 2023, FDL had sought the appointment of provisional liquidators over Canterbury.   ECF No. 2 ¶ 21.   The

Cayman Islands court appointed the Foreign Representatives as provisional liquidators over Canterbury on December 13, 2013, the same day the Cayman Islands court issued its initial, provisional quantum order against Canterbury. *Id.* ¶¶ 19, 21.

The Foreign Representatives were converted from provisional to official liquidators on January 16, 2024, when the Cayman Islands court entered a winding-up order against Canterbury. *Id.* ¶ 26. The ruling on the quantum of damages and final judgment was not made until January 31, 2024. *See* Cayman Islands Grand Court, Cause No: FSD 227 of 2018 (IKJ), Ruling on Measure of Damages, dated January 31, 2024, a true and correct copy of which is appended hereto as **Exhibit 8**. By then, it had already been determined that the time to appeal from the judgment against Canterbury would run for 14 days after the Cayman Islands court's order of January 31, 2024. *See* Cayman Islands Grand Court, Cause No: FSD 227 of 2018 (IKJ) Consent Order on Appeal (dated January 8, 2024), a true and correct copy of which is appended hereto as **Exhibit 9**. Following the quantum hearing, the Cayman Islands court entered judgment against Canterbury in favor of FDL in the amount of US $14,375,336.58 together with interest in the amount of US $1,707,071.22. *See* Exhibit 8 at ¶ 48. By then, as noted, the Foreign Representatives had already been deputized by the Cayman Islands court to decide whether to appeal from the judgments against Canterbury. They chose not to appeal, despite the facts known to them as detailed herein.

**C.    The Foreign Representatives' Cayman Islands Action Against the Non-Debtors.**

Rather than appealing from or seeking to correct the liability judgment, the Foreign Representatives instead doubled down on that judgment by bringing a fresh adversary case against Ms. Winczura, Canterbury Group and PFS. *See* ECF No. 2 ¶ 31(c). In that case, owing to Canterbury's (by that time under the control of the Foreign Representatives) purported non-compliance with the Cayman Islands court's disclosure orders, and Ms. Winczura's purported non-compliance with subsequent disclosure orders, the Foreign Representatives obtained a pre-

judgment freezing order preventing Ms. Winczura, Canterbury Group and PFS from dealing in their own assets (the "Freezing Order").  *See id.* ¶ 32; *see also* ECF No. 2-3.

The Freezing Order prevented Ms. Winczura, Canterbury Group and PFS from paying legal fees for Cayman Islands counsel, which resulted in their attorneys withdrawing from representing them.  Ms. Winczura then participated *pro se* before the Cayman Islands court as best she could until Ms. Winczura, Canterbury Group and PFS were all completely "debarred" from defending themselves or making any further submissions whatsoever in that case.

As discussed above, the Cayman Islands court had entered default judgments on liability against Ms. Winczura, Canterbury Group and PFS.  *See* ECF No. 2 ¶ 31(e).  Then, upon application of the Foreign Representatives (who controlled Canterbury by then) and by order of October 2, 2024, the Cayman Islands court issued an "unless order," providing that those three defendants would be "debarred" from participating in the case against them, unless they made further disclosures regarding Canterbury's assets, that Canterbury had previously disclosed in the FDL case (before the appointment of the Foreign Representatives as liquidators) as fortifying the informal agreement given by Canterbury (before the appointment of the Foreign Representatives as liquidators) not to dissipate the Proceeds; namely the Canadian Escrow.  *See* ECF No. 2-7.

Unbeknownst to Ms. Winczura at the time, after the Foreign Representatives were appointed liquidators of Canterbury, they undertook "investigations" of the Canadian Escrow. They contacted a representative of the Canadian Escrow who disclaimed knowledge of the Canadian Escrow; and he even disclaimed any prior dealings with Canterbury or Ms. Winczura. Based on that, the Foreign Representatives concluded (and conveyed to the Cayman Islands court, as they have now repeated before this Court), that the evidence of the Canadian Escrow previously

16

supplied by Canterbury "turned out to be forged documents" and that the Canadian Escrow "did not exist." *See* ECF No. 2 ¶ 20.

But the Foreign Representatives continue to make this assertion knowing it to be false. After the Cayman Islands court circulated to the parties (including *pro se* Ms. Winczura) the draft of the proposed debarment order, and Ms. Winczura only then appreciating the disclaimers of the Canadian Escrow had been erroneously made (and the result of impaired mental faculties of the man with whom the Foreign Representatives' agent communicated), Ms. Winczura *pro se* submitted an affidavit with exhibits (consisting of 186 pages) to both the Cayman Islands court and to the Foreign Representatives, that explained the situation and confirmed the Canadian Escrow was indeed genuine. *See* Affidavit of Erin Winczura, dated October 17, 2024, with exhibits, a true and correct copy of which is appended hereto as **Exhibit 10**.

That affidavit and the exhibits, including the sworn statement of Canterbury's contact for the Canadian Escrow, showed that: (i) Canterbury's prior disclosure of the Canadian Escrow all along had been genuine (and the Canadian Escrow indeed existed); and (ii) the claims of forgery and the disclaimers relied upon by the Foreign Representatives before the Cayman Islands court (and now relied upon by them before this Court (*see* ECF No. 2 ¶ 20)), are unfounded and mistaken. Both the Cayman Islands court (in debarring Ms. Winczura, Canterbury Group, and PFS from defending themselves in the Cayman Islands) and the Foreign Representatives (in repeating before this Court the disproven allegation of forgery with respect to the Canadian Escrow), are ignoring the plain evidence supplied by Exhibit 10.

As a result of the freezing order, the non-debtors were deprived of counsel. Thereafter, under those circumstances, the Foreign Representatives obtained a default judgment against the non-debtors and the debarring order. On those grounds, the Foreign Representatives have

succeeded in putting Canterbury Group and PFS into involuntary liquidation in the Cayman Islands. *See* ECF No. 2 ¶¶ 32-44. And on those same grounds, the Foreign Representatives are now seeking to deploy Chapter 15 to attempt to collect on the foreign judgments against the non-debtors on behalf of FDL with the imprimatur of this Court.

### III. LEGAL STANDARD

Chapter 15 empowers the Court to refuse to permit any action that "would be manifestly contrary to the public policy of the United States," including the continued recognition of a foreign bankruptcy proceeding. 11 U.S.C. § 1506; *see, e.g., In re British Am. Isle of Venice (BVI), Ltd.*, 441 B.R. 713, 716-17 (Bankr. S.D. Fla. 2010). This exception to recognition is intended to be invoked under exceptional circumstances concerning matters of fundamental importance to the United States. *See In re Iida*, 377 B.R. 243 (9th Cir. BAP 2007); *In re Atlas Shipping A/S*, 404 B.R. 726 (Bankr. SDNY 2009); *In re Ernst & Young, Inc.*, 383 B.R. 773, 781 (Bankr. D. Colo. 2008). Nevertheless, recognition under Chapter 15 of the Bankruptcy Code is not a "rubber stamp exercise." *In re Basis Yield Alpha Fund (Master*, 381 B.R. 37, 40 (Bankr. SDNY 2008). *Even in the absence of an objection*, courts must undertake their own analysis and grant or deny recognition under Chapter 15 as the facts of each case warrant. *See, e.g., In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 335 (SDNY 2008). The ultimate burden of proof on the requirements of recognition is on the foreign representative. *See id.* at 334. "When determining whether to apply [Chapter 15's public policy exemption codified in] Section 1506, courts have focused on two factors: (i) whether the foreign proceeding was procedurally unfair; and (ii) whether the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would 'severely impinge the value and import' of a United States statutory or constitutional right, such that granting comity would 'severely hinder United States

bankruptcy courts' abilities to carry out . . . the most fundamental policies and purposes' of these rights." *In re British Am Isle of Venize*, 441 B.R. at 716-17.

Although the exception is limited, it has been applied where there are conflicts between U.S. law and applicable foreign law. For example, if the relief sought would constitute or lead to *a violation of U.S. law*, that relief should be refused as contrary to the U.S. public policy. *Cf. In re Toft*, 453 B.R. 186, 198 (Bankr. S.D.N.Y. 2011). Further, with respect to the Cayman Islands court's freewheeling involuntary liquidation orders in this case, U.S. courts may apply section 1506 where the treatment of a party is dramatically different in the foreign venue than it would be in the United States. *Jaffe v Samsung*, 737 F. 3d 14 (4th Cir. 2013) (refusing to recognize German law conflicting with section 365(n) rights of a non-bankrupt licensee); *see also In re Sivec SRL*, 476 B.R. 310, 324-25 (Bankr. ED Okla. 2012).

## IV. **ARGUMENT**

As explained below, recognition of the Cayman Islands involuntary liquidation should be withdrawn for several reasons. *First*, recognition should be dismissed because the Cayman Islands proceedings departed from U.S. involuntary-bankruptcy law to such an extent that it violates fundamental public policy of the United States. *Second*, recognition should be dismissed because the underlying judgment in favor of FDL, that the Foreign Representatives (by this Chapter 15 case) are seeking to enforce, was obtained by fraud on the Cayman Islands court. *Third*, and most importantly, recognition should be dismissed because FDL used Canterbury and PFS (and is now using the Foreign Representatives, Chapter 15, and this Court) to consummate crimes committed in the United States. The crimes include market manipulation, sale of unregistered securities without exemption, and money laundering (by engaging in transactions with fraud proceeds and concealing the true identities of the individuals who are to receive the proceeds of the illicit securities trades).

It may be worth repeating, as previewed above, the Movant is not trying by this motion to relitigate the Cayman Islands judgment in favor of FDL.  That is not the point.  The evidence presented herein was available to the Foreign Representatives before they chose not to pursue an appeal from the Cayman Islands liability judgment, and before they came to this Court seeking its assistance.  Much of the evidence was not available to the Cayman Islands court and only came to light subsequently in Nevada.  Although, to be sure, some of the evidence was presented to the Cayman Islands court, the Cayman Islands judge misread and misunderstood it.  But the Foreign Representatives *do not* misunderstand it.  Nonetheless, for the benefit of FDL, they have decided, opportunistically, to run with a facially erroneous, fraudulently-obtained judgment that they know was contradicted by the evidence given *by FDL* in Nevada.

In any event, just as a U.S. court cannot be expected to give effect to a foreign judgment obtained by fraud and/or against the public policy of the United States, the Foreign Representatives should not be permitted to use Chapter 15 to obtain recognition of foreign judgments that would not otherwise be granted by U.S. courts in other contexts.  And as has been observed with respect to enforcement of U.S. securities laws in the context of bankruptcies, the overriding policy of enforcement notwithstanding bankruptcy filings, is "to prevent the bankruptcy court from becoming a haven for wrongdoers."  *Cf. SEC v. Elmas Trading Corporation*, 620 F.Supp. 231, 240 (D. Nev. 1985), *aff'd*, 805 F.2d 1039 (9th Cir. 1986) (quoting *Commodity Futures Trading Commission v. Co Petro Marketing*, 700 F.2d 1279, 1283 (9th Cir.1983)).

A.    **The Cayman Islands Punitive Involuntary Liquidation of Canterbury Should Not be Recognized.**

Before even considering the fraud on the foreign court or the securities law violations underlying this case, this Court's continued recognition of the Cayman Islands insolvency of Canterbury violates United States public policy because the United States Bankruptcy Code does

not permit what the Cayman Islands court did: placing Canterbury into an involuntary proceeding *as a punitive sanction without any finding of insolvency*. The Court could dismiss this proceeding pursuant to section 1506 on that basis alone.

Section 303 sets forth stringent procedural requirements for an involuntary bankruptcy in the United States. Those requirements exist to protect parties from serious and irreparable injury if improperly forced into bankruptcy. *See, e.g.*, *Higgins v. Vortex Fishing Systems, Inc.*, 379 F.3d 701, 707 (9th Cir. 2004). "A debtor hauled into bankruptcy court involuntarily risks the loss of credit, the inability to transfer assets in the normal course of business, as well as public embarrassment, and is often rendered incapable of conducting its business affairs. As such, courts have an obligation to carefully scrutinize the actions of a petitioning creditor in order to assure that an order for relief is only entered in such cases where it is truly appropriate." *In re E.S. Prof'l Servs., Inc.*, 335 B.R. 221, 225 (Bankr. S.D. Fla. 2005). "Because this weapon [of involuntary bankruptcy] is so potent, its use must be strictly monitored [and] . . . [i]mproperly exercised, a creditor can hold a business hostage unless its claim is satisfied. Because of this potential for abuse, the exercise of this power must be closely scrutinized." *In re Tichy Elec. Co. Inc.*, 332 B.R. 364, 376-77 (Bankr. N.D. Iowa 2005).

Section 303 was designed to discourage involuntary bankruptcy for two-party disputes. In the United States, involuntary bankruptcy is reserved for when an entity is actually insolvent. "Involuntary bankruptcy was not intended to redress the special grievances, no matter how legitimate, of [a] particular [creditor] of a business . . . Petitioning [c]reditors must seek redress under state law, in the state courts and not in the bankruptcy court." *In re E.S. Prof'l Servs., Inc.*, at 225. "Involuntary bankruptcy is not to be used as a forum for the trial and collection of an

isolated disputed claim." *In re Murrin*, 477 B.R. 99, 106 (D. Minn. 2012); *see also, In re Tichy Elec. Co. Inc.*, at 376-77.

In the United States, if a creditor files an involuntary petition, the proposed debtor is granted the immediate protection of the automatic stay, retains control of its assets and business operations, and has the absolute right to participate in the petition process. That is not what happened to Canterbury in the Cayman Islands. In the United States, section 303(b) requires creditors with noncontingent claims, not subject to a *bona fide* dispute, to file a petition. That is not what happened to Canterbury in the Cayman Islands. In the United States, a debtor is entitled to respond to the petition and a trial is mandated to determine whether the debtor is indeed insolvent and whether relief under the Bankruptcy Code is warranted. That is not what happened to Canterbury in the Cayman Islands.

Because of the severe damage that involuntary bankruptcies can cause, the Bankruptcy Code also penalizes a creditor harshly if the petition was improperly brought; for example, if brought where the proposed debtor is not actually insolvent. Section 303(i) exposes petitioning creditors to damages caused by an improper filing, in some cases punitive damages. A bankruptcy court can also require petitioning creditors to file a bond to indemnify the involuntary debtor for future damages. 11 U.S.C. § 303(e). That is not what happened to Canterbury in the Cayman Islands.

In this case in the Cayman Islands, the involuntary liquidation was freely weaponized for the benefit of FDL in a two-party dispute with Canterbury. FDL merely made an application, as a contingent judgment creditor, that was granted as a punitive sanction against Canterbury for purportedly failing to comply with discovery orders, and with no evidence whatsoever that Canterbury was insolvent. *See* 11 U.S.C. § 303(h)(1) (requiring proof of insolvency). Unlike in

the Cayman Islands, in the United States, where an entity is not insolvent, involuntary bankruptcy is not authorized by the Bankruptcy Code. In this case, the use of the Cayman Islands involuntary insolvency regime for the benefit of FDL, a creditor in a two-party dispute, where the "debtor" was not shown to be insolvent, is contrary to United States public policy embodied by the Bankruptcy Code provisions for involuntary bankruptcies.

**B.     This Chapter 15 Case Should Be Dismissed Because the Underlying Judgment Was Obtained by Fraud on the Foreign Court.**

In the preliminary litigation relating to AML rules and the ownership of FDL, the Cayman Islands court found in favor of Canterbury and, indeed, found that it was provided with false testimony and fake documents in connection with that litigation. During the trial on the merits, the Cayman Islands court upheld those earlier findings and concluded that *even during the trial on the merits* the court was lied to and was given fake documents by FDL. *See generally* Exhibit 5 at ¶¶ 133-145. Nonetheless, the Cayman Islands court denied Canterbury's fraudulent inducement and unclean hands defenses and inexplicably found that FDL's lies and fake documents were somehow irrelevant to Canterbury's defenses because—on the basis of pure supposition and speculation—the Cayman Islands court *assumed* that Mr. Chen must have been the UBO of FDL at the time the relevant transactions between FDL, Canterbury, and PFS were consummated. *See* Exhibit 5 at ¶ 145. While he found that FDL's explanations made no sense and were not credible, the judge supposed that what must have happened is that Mr. Chen transferred his ownership of FDL to Mr. He *after* the relevant transactions took place. Because Mr. Chen was the UBO at the time of the transactions, the Cayman Islands court reasoned, no AML problem existed, and the relevant agreements were valid.

As the Cayman Islands court recounted in its judgment on the merits, after Canterbury raised the issue of non-compliance with AML requirements with the Cayman Islands court in 2019,

the Cayman Islands judge ordered FDL to respond to Canterbury's demands for relevant information.  FDL attempted to comply by providing certain documents purportedly showing that the switch from Mr. Chen to Mr. He was accomplished earlier, in February 2018, before FDL's relationship with Canterbury began.  Mr. Sin explained that although Mr. He became the UBO of FDL in February 2018, Mr. Sin continued to represent Mr. Chen as the beneficial owner because the relevant corporate documents had not been properly updated by the registry in the British Virgin Islands ("BVI"), where FDL was domiciled, and he blamed his own misunderstanding of the meaning of beneficial ownership.  Mr. Sin claimed he thought that until the relevant documents were properly updated by the registry in BVI, Mr. Chen continued to be the technical owner of FDL despite having sold it to Mr. He.  *See* Exhibit 5 at ¶ 139.  The Cayman Islands court did not accept these explanations.  Among other things, FDL had produced contradictory and implausible corporate documents and offered implausible explanations for their contradictions and for FDL's inability to provide original communications and documents that would support Mr. Sin's various explanations of the contradictions.  *See id.* ¶¶ 136-37.

FDL tried to address these issues through Mr. Sin's trial testimony and by offering into evidence copies of additional, purportedly corroborating, contemporaneous documents.  Those included a copy of what it claimed to be the actual share swap agreement between Mr. Chen and Mr. He, showing the exchange of Mr. Chen's FDL interest for an interest in a company purportedly owned by Mr. He.  FDL also offered "Sold and Bought Notes" and an "Instrument of Transfer," all dated February 1, 2018.  But, as the Cayman Islands court found, there was not "a single piece of contemporaneous evidence demonstrating [the change in] beneficial ownership of FDL prior to the autumn of 2018 and/or evidencing the creation of these documents in early 2018."  *See* Exhibit 5 at ¶¶ 133-37.

FDL offered no proof that the corporate changes were made when Mr. Sin claimed they were made, and Mr. Sin had no credible explanation for the conflicting information provided to Canterbury and the Cayman Islands court about the changes in FDL's ownership and control.  As the Cayman Islands court noted, Mr. Sin's explanation "is entirely inconsistent with the documents that FDL provided to Canterbury in [2019] which suggested that incoherent, rushed attempts had been made in October 2018 to retrospectively document the changes of directorship said to have occurred on 1 February 2018."  *See id.* at ¶ 136.  Most significantly, the Cayman Islands court found that the documents FDL submitted were forgeries, to wit:

> *The new corporate documents which seek to clarify the past confusion can surely only have been created after my April 2020 AML Judgment.* If the right documents had been carefully prepared in early 2018 and duly executed, why would such hapless attempts have been made in October 2018 to do it all over again? One would normally expect the registered office service provider to draft official corporate records, send them to the client to execute and return and then the service provider would promptly register them. Since [the registered office service provider] is based in BVI, Mr. Sin in Hong Kong and Mr. Chen and Mr. He in either Hong Kong or Mainland China, such communications would be expected to take place in part at least by email.
>
> …
>
> *There is not a jot of contemporaneous documentary evidence supporting the proposition that Mr He was held out to anyone anywhere in the world as being the FDL owner and a director before October 2018.* It seems more plausible that Mr. Sin, who was clearly held out to the world as a director in the first half of 2018, was in substance appointed in early 2018. It seems improbable that the change of beneficial ownership occurred in early February at all. This was the version of events Mr. Sin was required to verify in his oral evidence.
>
> …
>
> *Mr. Sin … admitted under cross-examination that the Canterbury Account Opening Form he assisted Mr Chen to complete gave a misleading impression because Mr. Chen had ceased to be a shareholder/director since 1 February 2018.* His explanation was that because the corporate records had not yet been changed at the registered office and the only documents he could produce still showed Mr Chen's involvement, he and Mr. Chen signed the Account Opening form on this basis. *He had no credible explanation for the absence of contemporaneous documents such as emails relating to the change of ownership issue. He explained not inserting*

> *Mr He as beneficial owner by failing to understand at that time the concept of beneficial ownership.*
>
> …
>
> I remained deeply suspicious during his evidence, as I was when delivering my AML Judgment on 15 April 2020, about the truth of the assertion that these significant changes had actually happened in [sic] 1 February 2018 at all.
>
> …
>
> *Try as I might, I find it impossible to believe that the change of ownership both occurred and was formally documented on 1 February 2018 as Mr Sin claims….*

*See id.* at ¶¶ 136-142  (emphases added).

Having found that Mr. Sin lied to the court and that FDL offered manufactured evidence at trial, the Cayman Islands court nonetheless inexplicably decided to give FDL a pass.  Having found all relevant evidence to have been contradictory and fraudulent, the Cayman Islands judge said that "[t]he admittedly circumstantial evidence" pointed him to a conclusion that Mr. Chen appointed Mr. Sin "in early 2018" but overlooked the corporate formalities.  Then, on a hunch and without any evidence, he decided that Mr. Chen must have, in any event, somehow remained the owner of FDL throughout the relevant period, stating:

> Mr. Chen remained the beneficial owner of FDL both legally and beneficially. This is why Mr. Sin continued to use Mr. Chen's email address. This is inherently unlikely to have occurred if in reality Mr. He had in substance become beneficial owner of FDL on 1 February 2018, regardless of what the corporate records showed;
>
> [I]n or after October 2018, Mr Chen and Mr He decided that the latter should replace the former as legal and beneficial owner of FDL for reasons which are unclear but might well be connected with the onset of potentially embarrassing litigation.    This potentially explains the equivocation about the beneficial ownership position by FDL in its pleadings in proceedings in the US in late 2018;
>
> *FDL thereafter in response to Canterbury's March 2019 AML compliance letter falsely represented to Canterbury that a change of legal and beneficial ownership had actually occurred with effect from 1 February 2018 which was only formally documented several months later. In fact a decision was made months after 1*

> *February 2018 to retroactively document the change as having taken place on that earlier date.*

*See id.* at ¶ 144 (emphasis added).

Based on these suppositions, the Cayman Islands court further found that "FDL did not induce Canterbury to enter into the Brokerage Contract by making fraudulent misrepresentations about its beneficial ownership . . . Any fraudulent misrepresentations which were made were made after the commencement of the present proceedings in response to a compliance letter sent out by Canterbury in March 2019.  Canterbury's 'unclean hands' defence fails in this additional respect." *See id.* at ¶ 145.  In other words, had the Cayman Islands judge believed that Mr. Chen did not own FDL at the time the relevant transactions took place, he would have necessarily upheld Canterbury's fraudulent inducement defence to FDL's contract claim and Canterbury's unclean hands defense to FDL's equitable claims.

There is one glaring problem with that finding:  As the Foreign Representatives *now* know full-well, this particular (and peculiar) finding by the Cayman Islands court regarding the identity of the UBO of FDL (and when), however flimsy it was when made, was in fact obtained by fraud on the Cayman Islands court.  It may be true the relevant fraudulent documents were created after Canterbury first raised the AML issue.  But the reason for that was not sloppy disregard for corporate formalities; it was because Mr. Chen *was dead* when the relevant transactions took place.

Specifically, on May 4, 2018 (months before the August transaction involving PFS), in connection with the opening of its account at Canterbury, FDL (acting through Mr. Coleman) directed VStock Transfer ("VStock"), the transfer agent for YRIV that had custody of FDL's YRIV shares, to transfer 500,000 of its YRIV shares to FDL's newly opened account with Canterbury.  In making this request, Mr. Coleman emailed a "Transfer Instruction Form" supposedly signed by Mr. Chen (despite, according to FDL, Mr. Chen no longer being a director

of the company) to Vstock along with a "Shareholder Signature Indemnity" form signed by Mr. Coleman confirming the authenticity of Mr. Chen's signature on the Transfer Instruction Form. Unbeknownst to Canterbury (and contrary to Mr. Coleman's verification of authenticity), Mr. Chen's signature on the May 4, 2018 "Transfer Instruction Form" was almost certainly forged. At trial in Nevada, Mr. Coleman reaffirmed his prior deposition testimony that Mr. Chen had died in early 2018 and admitted he did not know if Mr. Chen was still alive as of May 4, 2018. According to Mr. Coleman, Mr. Chen died in early 2018 within a month or two after signing an account application at another broker dealer, White Sands on January 23, 2018. *See id.* at pp. 44-47 (Ex. 6 to Exhibit 10 appended hereto). Mr. Coleman also admitted that he did not personally observe Mr. Chen sign that document. *See id.* at pp. 58-62 (Ex. 8 to Exhibit 10 appended hereto). Mr. Sin admitted in the Nevada trial that Mr. Chen's signature was not a wet signature, rather it was electronic. *See* Exhibit 10 at pp. 48-57 (Ex. 7 to Exhibit 10 appended hereto). In other words, at a minimum, Mr. Coleman certified as true Mr. Chen's signature without knowing who placed the electronically-stamped signature on that document.

On August 3, 2018, FDL (again, acting through Mr. Coleman) sent an email to VStock directing VStock to transfer 6,000,000 YRIV shares owned by FDL to FDL's securities account with Canterbury. Again, this request was made in the form of a "Transfer Instruction Form" accompanied by a "Shareholder Signature Indemnity" form signed by Mr. Coleman attesting to the authenticity of Mr. Chen's signature on the Transfer Instruction Form. This time, however, the Transfer Instruction Form was clearly not signed by Mr. Chen. Rather, this Transfer Instruction Form was signed by Mr. Sin (as admitted by both Mr. Sin and Mr. Coleman at trial in Nevada). *See id.* at pp. 63-74 (Ex. 9 to Exhibit 10 appended hereto). In fact, at trial in Nevada, Mr. Coleman

unequivocally confirmed that Mr. Chen died prior to August 3, 2018.  *See id.* at pp. 75-78 (Ex. 10 to Exhibit 10 appended hereto).

To state the obvious, had Mr. Chen still been alive on August 3, 2018, there would have been no need to forge his signature and to certify that forgery as Mr. Chen's genuine signature. Mr. Chen's demise explains why Mr. Sin forged Mr. Chen's signature on the share transfer form used to transfer the 6,000,000 YRIV shares to Canterbury.  It explains why Mr. Coleman admitted to attesting that the forged Chen signature was genuine (a felony).  It also explains the contradictory corporate documents and absence of communications with the corporate registrar service in BVI or the BVI corporate registry.  Most importantly, the fact that FDL used Mr. Chen after his death—and then inserted a Mr. He when asked for an explanation of the change from Mr. Chen—is evidence that Mr. Chen (and/or Mr. He) was merely a nominee in a wide-ranging fraud scheme (described in further detail below).  It was Mr. Sin and Mr. Coleman who appeared to be the people running the show in the U.S, after taking direction from the YRIV chairman in China, as explained below.  In retrospect, it is not surprising that, for one excuse or another, neither Mr. Chen nor Mr. He ever made a personal appearance in any aspect of the transactions between FDL and PFS or in dealings with Canterbury, or even in litigations.  It mattered not at all whether FDL was owned by a Mr. Chen, a Mr. He, or a Mr. Smith.  As described below, FDL was merely an instrumentality of a fraud orchestrated by other people out of China.

In any event, at best, the Cayman Islands court had no reliable evidence for ascertaining who owned FDL and when.  That means, of course, that FDL did not comply with its AML disclosure obligations and that *to this day*, neither the Cayman Islands court nor the Foreign Representatives know the true identities of the real owners of FDL.  It also means that the Cayman Islands judge ordered damages to be paid to unknown persons; "admittedly circumstantial

evidence" is not the same thing as concrete, specific knowledge. Indeed, if the Foreign Representatives succeed in using this Court and Chapter 15 to recover sums for the benefit of FDL, to whom do they plan to send money without running afoul of AML requirements? More pressingly, if FDL is advancing the costs to the Foreign Representatives of this litigation—say if they are the source of the US $35,000 that is the predicate of "jurisdiction" here—do the Foreign Representatives know who is sending them money, the origin of that money, or for whom they are acting as agent? Note, Mr. Sin testified in the Cayman Islands litigation that some of the money obtained by FDL from PFS was indeed used to fund the litigation against Canterbury. *See* Cayman Tr. Excerpt, Day 4, p. 118, a true and correct copy of which is appended hereto as **Exhibit 25.** If that is true, and if the Foreign Representatives are being paid by FDL, as explained below, the Foreign Representatives are being paid with fraud proceeds.

**C.    This Chapter 15 Case Should Be Dismissed Because the Foreign Representatives Are Here Before this Court Pursuing the Profits from a Securities Fraud Scheme.**

After the Hindenburg Report was published, an investigation by FINRA followed. FINRA's investigation found evidence of market manipulation. FINRA then referred YRIV to Nasdaq for further investigation and possible delisting. As described below, the evidence adduced in both the Cayman Islands and the Nevada court proceedings confirmed FINRA's findings of market manipulation, as well as similar findings by the Nasdaq Regulation Staff. Nasdaq delisted YRIV in response to FINRA's investigation as well as its own findings. Most importantly for the Court's consideration here, the Cayman Islands and Nevada evidence supports the conclusions that: (i) FDL and others affiliated with YRIV were involved in illegal market manipulation; and (ii) FDL was used by YRIV and the other conspirators to sell unregistered, restricted securities as part of this fraudulent scheme.

Here is how the Nasdaq Hearings Panel (which handled YRIV's appeal from the Nasdaq

Regulation Staff's recommendation to delist YRIV based on findings of market manipulation,

among other things) summarized FINRA's findings:

> "[FINRA] advised Staff that it had identified trading activity in the Company's
> shares surrounding the release of the Hindenburg Report and found evidence of
> potentially manipulative trading activity in accounts possibly connected to, and in
> one case, funded by, the Company. [FINRA] found that two of the accounts in
> question were in the names of original shareholders of the Company, one account
> listed an authorized trader who is also a Company advisor, and several of the
> brokerage accounts were in the names of individuals who appear to be neighbors
> of the Company's Chief Executive Officer, Xiangyao Liu. Three of the accounts
> used the same address as the Company's principle [sic] offices in New York.
> Further, [FINRA] identified three wire transfers into one of these accounts where,
> according to Staff, the "originator" of the incoming wire transfers was also located
> at that same address. The eight identified accounts represented approximately 40%
> of trading activity in the stock for a two-week period. Matched orders were
> identified in two of the accounts.

*See* August 16, 2019 Nasdaq Letter to James Coleman YRIV, a true and correct copy of which is

appended hereto as **Exhibit 11**.

In the Cayman Islands proceeding, Mr. Sin admitted to certain critical elements of the

FINRA findings.  For one, he admitted that FINRA's findings were specifically referring to FDL.

*See* Cayman Tr. Excerpt, Day 4, pp. 98-108, a true and correct copy of which is appended hereto

as **Exhibit 12**.   Mr. Sin admitted in his testimony in the Cayman Islands that the original

shareholders and "neighbours" referenced in FINRA's findings were Mr. Chen, Mr. He, and a

Mr. Long, and that the referenced bank account was in fact the FDL TD Bank account into which

PFS's US $10 million was wired, and to which Mr. Coleman had access, as shown below.  *See id.*

In other words, he confirmed that FINRA's findings of market manipulation directly referred to

FDL's conduct.  As also noted further below, Mr. Coleman, whom YRIV touted as the company's

U.S. advisor, was listed as having authority to trade FDL's YRIV shares on an account-opening

application for another Cayman-based broker dealer, White Sands.  *See* January 23, 2018 White

Sands Securities Application, and true and correct copy of which is appended hereto as **Exhibit 13**.

## D.    Following a Fraud Referral by FINRA, Nasdaq Delisted YRIV.

Following FINRA's referral, and after its own investigation, Nasdaq Regulation Staff

notified YRIV on May 29, 2019 of its determination to delist YRIV.  In that notification letter, the

Nasdaq Regulation Staff gave the following reasons for its decision:

> [T]he facts in this matter – including the *Company's efforts* to direct trading activity
> in an apparent effort to artificially support its stock price, its false and misleading
> statements in press releases and to Nasdaq Regulation Staff ("Staff"), and its
> concession to Staff that it has failed to make "any significant progress" towards
> executing its business plan since listing more than two years ago raise public
> interest concerns that warrant delisting in accordance with Listing Rule 5101.

*See* Exhibit 11 (referring to May 29, 2019 notification; emphasis added).  Nasdaq Regulation Staff

also noted that "[YRIV's] false and misleading statements to Staff separately constitute[d] a

violation of Listing Rule 5250(a)."

YRIV appealed the Nasdaq Regulation Staff's decision and findings to the Nasdaq Hearing

Panel.  *Id.*  But the Hearing Panel could not verify the results of FINRA's and the Nasdaq

Regulation Staff's investigations because YRIV stonewalled it and failed to engage meaningfully

with the hearing on appeal.  It stated, in relevant part:

> Following a hearing in which these issues were discussed by all parties, as reflected
> in the transcript, the Panel sought post-hearing briefs, based on its appraisal that the
> information regarding potential trading improprieties was not fully developed.
> While the parties did not present new or particularly clarifying information
> regarding trading improprieties in the post-hearing [submission], the lack of action
> taken by the Company given an additional month to address Staff concerns
> confirms the Panel's inclination, at the hearing, that a delisting is warranted.
>
> On this record, the Panel cannot determine whether the Company, its associates, its
> affiliates or other parties have engaged in stock manipulation or whether the
> allegations in the Hindenburg Report and the [FINRA] investigation will prove
> true. But these are serious matters that deserve independent investigation and full
> transparency, good faith cooperation with regulators, and full engagement by the
> Board. *The Company, however, given ample opportunity to address these matters*

*responsibly, has not demonstrated that a fully independent investigation of the Hindenburg allegations, led by competent and disinterested individuals, in fact occurred. The Company's discussion of the investigation that took place was cursory, and no member of the Special Committee attended the hearing, made a statement, or was available to answer questions. The Special Committee did not include a member of the Audit Committee, and was not advised by an independent law firm.*

*Of even more concern, the Company's Board apparently has not conducted an independent investigation into the [FINRA] allegations. Company representatives at the hearing – the Executive Director and advisors to the Company – vigorously denied that "the Company" had funded any of the accounts identified by [FINRA]; but did not address or seem concerned with the possibility that associates, shareholders and owners, whose interests are aligned with the Company's, may have facilitated stock manipulation.*

*Finally, the Company has, even after being prompted by the Panel to resolve the disclosure issue, continued to stall and make proposals for disclosure, rather than actually inform the market.*

Exhibit 11 (emphases added).

In other words, the Nasdaq Hearing Panel attempted to make an independent inquiry to verify FINRA's and the Nasdaq Regulation Staff's findings but was unable to do so because YRIV failed to engage meaningfully.  At that point, the Hearing Panel did the only thing it could; it ordered the delisting of YRIV, noting that "[i]n sum, the Company's corporate responses to three distinct events signaling potential harm for investors has fallen short of the appropriate actions expected of a listed company."  *Id.*  That decision of the Hearing Panel was later upheld by the Nasdaq Listing and Hearing Review Council on October 17, 2019.[4]  It is fair to conclude that YRIV (and specifically Mr. Coleman) did not engage with the Nasdaq Hearing Panel because

---

[4] *See* Yangtze River Port and Logistics Ltd. (23 Oct. 2019), Form 8-K 2019. Retrieved from SEC EDGAR website:
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001487843/000121390019020916/f8k101719_yangtzeriver.htm

doing so would have incriminated them even further.  They chose to stay silent, and Nasdaq made the appropriate negative inference from their silence.

**E.      As FINRA Had Found, Mr. Sin, Mr. Coleman and Others Affiliated with FDL and YRIV Took Steps to Artificially Prop Up the Trading Price of YRIV Stock.**

In another lawsuit filed in by FDL and YRIV in May 2018 against an investment company, America 2030, and relating to a transaction in which FDL attempted to use YRIV stock as collateral for a loan, Mr. Sin and Mr. Coleman submitted affidavits—and alleged in the complaint against America 2030—that YRIV was taking steps to *"dry up"* the volume of publicly available stock in YRIV.  *See FDL and YRIV vs. America 2030 Capital*, New York Supreme Court, Index No. 652158-2018, Complaint, a true and correct copy of which is appended hereto as **Exhibit 14;** *see also* Sin Affidavit, a true and correct copy of which is appended hereto as **Exhibit 15** and Coleman Affidavit, a true and correct copy of which is appended hereto as **Exhibit 16**.  As with Canterbury and PFS, in that case, acting for FDL, Mr. Sin and Mr. Coleman used America 2030 to raise money ($2 million in that case) for YRIV purportedly to complete the acquisition of the Wuhan Economic Development Port.  *See* Exhibit 14 at ¶ 22.  They alleged in that case that the stock price of YRIV was "critical for YRIV's ability to obtain financing in order to finish the [port] acquisition.  *Id.* ¶ 33.  They alleged that "[w]ithout completing the acquisition, YRIV could be permanently damaged to the point of bankruptcy or simply going out of business." *Id.* ¶ 23.  They also alleged, that "[t]his specific acquisition is not replaceable."  *Id.*  To be sure, both Mr. Sin and Mr. Coleman claimed that "drying up" YRIV volume was needed to combat a short seller.  *See* Exhibits 15 & 16.  But, even if that were true, what they admitted is that they took coordinated, affirmative steps to prop up artificially the YRIV stock price.

In their various testimonies both in the Cayman Islands and Nevada, Mr. Sin and Mr. Coleman testified directly about how they managed to "dry up" the volume of YRIV stock.

To begin, most YRIV shares were held by a small group of individuals who were purportedly the original investors in YRIV (or its predecessor companies). *See* Exhibit 10 at pp. 109-151 (Expert Report of Jason Flemmons) (Ex. 12 to Exhibit 10 appended hereto). Both men testified that YRIV instructed its shareholders to hold their shares in a manner that would reduce the public float and make it impossible for someone to borrow those shares to short YRIV, *i.e.*, to take their shares out of the market. *See, e.g.,* Cayman Tr. Excerpt, Day 3, pp. 77-86, a true and correct copy of which is appended hereto as **Exhibit 17.**

Mr. Sin initially admitted that the founding shareholders met about this issue. *Id.* He then caught himself and said YRIV was telling this to all shareholders and there was no meeting of the founders. *Id.* (We are not aware, of course, of any evidence that YRIV was communicating about this with its shareholders generally, and it would be improper for it to do so.) And then he admitted that all of the founding shareholders kept their shares out of the market, either in certificate form or at VStock; he knew and testified to how and where almost all of them held their shares. He also admitted that YRIV was able to monitor trading and notice "unusual" activity in its stock because it knew that most of the shares were held by the founding shareholders *out of the market*. *See id.* at p. 84.

Mr. Coleman confirmed Mr. Sin's testimony. Mr. Coleman testified in a deposition in Nevada that YRIV suggested to its shareholders that they move their YRIV shares to its transfer agent, VStock. He testified: "the transfer agent doesn't do transactions. They don't lend stock out. They don't do trades. They just hold the stock in electronic form. That was one of the -- a very successful tactic of drying up the volume and reducing the amount of shares out into the trading public's hands in the form of a brokerage firm." *See* Transcript, excerpt from the deposition of James Coleman on Sept. 27, 2023, a true and correct copy of which is appended

hereto as **Exhibit 18**.  This is textbook market manipulation; they took steps to "dry up" the float, *i.e.*, take shares out of the market to make sure that no one—neither one of their co-conspirators with large holdings nor anyone else—would be able to sell enough shares, such that the supply of those shares into the market could reduce YRIV's artificially inflated price.

This lines up with the circumstances of the case involving Canterbury and PFS.  When Canterbury began selling FDL's YRIV shares that it held as collateral for the Put Option in response to the Hindenburg Report, FDL ran into court in the Cayman Islands *to halt* the sale of shares by Canterbury and to order Canterbury *to buy back* the shares it sold.  This would make no sense if FDL and YRIV were not acting together to prop up YRIV share price artificially.  Consider that if FDL were merely an investor holding YRIV shares and it learned bad news about YRIV, FDL would naturally be motivated to sell those shares as quickly as possible and at the highest possible price.  This is why the market reacted as it did to the Hindenburg Report.  And, had the Hindenburg Report turned out to be wrong, FDL could have taken the cash realized from the sale of YRIV shares and bought them back as the price recovered.  There is no better evidence of collusion to manipulate the market than FDL's and YRIV's admissions in the *America 2030* lawsuit and its initial response to the liquidation of Collateral Shares by Canterbury.  It was only later, after the market sell-off, that FDL changed its tune and sued Canterbury for damages.

There was other compelling evidence, as FINRA found, for the inescapable conclusion that FDL, YRIV, Mr. Sin, Mr. Coleman, and others engaged in market manipulation and coordinated their efforts.  For example, as noted above, Mr. Coleman, a director of YRIV and its representative in the U.S., was listed as the individual with authority to trade FDL's YRIV shares on an FDL opening account application for another Cayman-based broker dealer.  *See* Exhibit 13.  As reflected in contemporaneous communications, Mr. Coleman had access to (*i.e.*, was an authorized user or

was given an authorized user's credentials) *FDL's* TD Bank account into which FDL received the
US $10 million from PFS.  *See* Certain WhatsApp messages, a true and correct copy of which is
appended hereto as **Exhibit 19**.  Indeed, Mr. Sin asked Mr. Coleman to check whether the money
from PFS had arrived and Mr. Coleman helpfully responded that he had been checking.  Banks do
not give access to account information to people not properly authorised to receive it.  More to the
point, owners of businesses do not give access to their business accounts to people who are not
involved in their business.  Significantly, this is the same TD Bank account that was flagged by
FINRA.  And, as FINRA and Nasdaq Regulation Investigators found, FDL and YRIV shared the
same physical address in New York.  FDL's TD Bank account listed that same address.

It also came out in the Cayman Islands trial that in dealing with Canterbury and PFS,
Messrs. Sin and Coleman took direction from the chairman of YRIV, a Mr. Liu Xiangyao.  In fact,
certain WhatsApp messages offered into evidence in the Cayman Islands, as well as relevant
testimony, leave no doubt that Mr. Coleman and Mr. Sin took direction from YRIV's Chairman
Liu regarding FDL's YRIV shares.  *See* Exhibit 19; see also *See* Cayman Tr. Excerpt, Day 3, pp.
146-49, a true and correct copy of which is appended hereto as **Exhibit 20.**  In the most telling
exchange, Chairman Liu dictated a WhatsApp message to Canterbury in which the Chairman
expressed his displeasure that he had not yet received the US $10 million from PFS.  In doing so,
Chairman Liu revealed that the FDL shares were owned (or at the very least controlled) by him
and others associated with YRIV.  The dictated message (reproduced by Mr. Sin) says that if the
money does not arrive immediately, the Chairman will take back the 6 million shares deposited
with Canterbury, including the portion that was sold to PFS, to wit:

Erin;

I really don't want to Send the message as below from China Party. They are so
disappointed about the situation and they would like me to express their thinking,

and further action will be taking in place soon. The first message as below and regarding about the DTC and shares matter I am not saying here until you give us the real and honest answer.

The message here from the term [sic]:

"If you can't remit and wiring the US$10M of the transaction today 08-30-2018 with the tracking code and proof of bank wiring confirmation from the remittance Bank, then you can terminal [sic] the deal and we believe that you are no longer Honor of the transaction too. So, *we will take back the 6 Million shares from Canterbury to Vstock Transfer LLC*, It will be no longer necessary, and the purpose of the funding become meaningless. Because it is too late to receive the said fund for closing M&A deal in China. When we started this transaction, you aware that the timing and schedule, you understood that running out of time. And we are be very patient to waiting for you to response about the status of wiring. But It doesn't make sense of wiring the fund since last Friday 08-24-2018 till today Thursday 08-30-2018 and with no proof of confirmation and tracking Code. It can't be paid in a month then like last time our own fund of $165K has been placed an instruction."

**Exhibit 19** (emphasis added).   Having first admitted that this message was dictated by the Chairman, Mr. Sin attempted to backtrack, claiming that the portion of the message dealing with taking back the 6 million shares was not a threat by Chairman Liu to Canterbury, but, rather, a recommendation he made to Mr. He.  *See* Exhibit 20 (This is the same Mr. He whom the Cayman Islands judge found not to have been the owner of FDL at this time.)

That, of course, makes no sense.  To begin with, Mr. He had not yet made an appearance and the text does not mention him and is not addressed to him.  Rather, the WhatsApp message is addressed to Erin by Mr. Sin and introduced as a message to her from the Chairman.  It also says, "*we* will take back the 6 million shares from Canterbury" (emphasis added); it does not say Mr. He (or Mr. Chen, or even Mr. Sin) would do so.  This was a message dictated by Chairman Liu to be passed to Ms. Winczura; and the Chairman uses the plural personal pronoun "we."  A plain reading is the Chairman was speaking for himself and on behalf of others acting in concert with him and implicitly acknowledging that the 6 million YRIV shares sent to Canterbury were only nominally owned by FDL.  Even if, contrary to common sense, this statement did reflect a mere

38

"recommendation" to Mr. He, it contradicts other testimony by both Mr. Sin and Mr. Coleman that YRIV and its founding shareholders, which included the Chairman, were taking steps to take YRIV shares out of the market to "dry up" the float.   To believe that this was merely a recommendation, in other words, one also has to believe the Chairman was indifferent to what happens to the 6 million YRIV shares purportedly owned by Mr. He.   What makes more sense is that a "recommendation" to Mr. He is an admission that Chairman Liu, Mr. Sin, and Mr. Coleman acted together with respect to the transaction with PFS and that Chairman Liu could, and did, speak on behalf of FDL and whoever nominally owned it, be it Mr. He or Mr. Chen or someone else. (It is obvious that a "recommendation" to Mr. He would not be sent to Ms. Winczura.)

One should not forget, as further evidence of the fraudulent scheme, that Mr. Sin forged Mr. Chen's signature on instructions to the transfer agent to move the 6 million YRIV shares to Canterbury and that Mr. Coleman admitted that he falsely certified Mr. Sin's forgery as the authentic signature of Mr. Chen.   There are only two possibilities here:  One is that Mr. Chen was dead, and Mr. Sin signed for a dead man in order to get FDL's YRIV shares to Canterbury because Mr. Chen was merely a nominee (and it did not matter whether he was dead or alive). Or, alternatively, if either Mr. Chen or Mr. He "owned" FDL on August 3, 2018, the fact that Mr. Coleman and Mr. Sin did not bother to get either of those men to sign the transfer of shares (nominally worth some US $60 million at the then-prevailing market price) also inexorably points to the conclusion that the "owners" of FDL were mere nominees and that FDL was only a vehicle for using YRIV shares in a fraudulent scheme orchestrated in China with Messrs. Sin and Coleman the foot soldiers in the U.S., who did whatever it took to monetize the scheme.

Further evidence of collusion among the co-conspirators is that Mr. Sin was privy to insider information about YRIV.   Specifically, as discussed above, in the *America 2030* litigation, Mr. Sin

and Mr. Coleman alleged that YRIV needed US $2 million for the Wuhan Economic Development Port.  *See* Exhibit 14 at ¶ 22.  They said the same thing to PFS and Canterbury, except the amount needed was now US $10 million.  *See* Cayman Tr. Excerpt, Day 3, pp. 135-45, a true and correct copy of which is appended hereto as **Exhibit 21.**  At one point in Mr. Sin's testimony, he was asked about the fact that although YRIV had publicly announced the port deal and claimed that the deal expired on July 31, 2028, FDL was still trying to obtain funds for that deal from PFS in August 2018.  *See id.*  After confirming that he was speaking about the same "irreplaceable" deal that was mentioned in the *America 2030* litigation, Mr. Sin admitted that he knew from conversations with the Chairman and Mr. Coleman that YRIV had been able to extend the time to close the port deal and that YRIV was waiting for the US $10 million from PFS to complete the transaction.  The upshot of this exchange is that FDL and Mr. Sin were YRIV insiders with access to material non-public information, assuming, of course, that there was, in fact, a port deal.  Alternatively, as part of a fraudulent scheme to obtain US $10 million from PFS, FDL was using the pretense of an imaginary port deal potentially failing to put pressure on PFS to send it US $10 million.

Finally, at the end of his testimony, Mr. Sin was asked where the US $10 million that it obtained from PFS had gone.  On September 5, 2018, only days after PFS sent FDL US $10 million, ostensibly for the port acquisition, YRIV announced that the port deal fell through, and no acquisition would take place.  *See* Sept. 5, 2018 YRIV 8-K, a true and correct copy of which is appended hereto as **Exhibit 22**  One might think that one of two things would follow: either FDL would back out of the transaction with PFS if it knew in advance that the port deal was about to fail (as it should have because Mr. Sin admitted to speaking to the Chairman and Mr. Coleman about the progress of the purported port deal), or, alternatively, FDL would keep the

proceeds of the sale of its YRIV shares to PFS because YRIV no longer needed the US $10 million
that FDL claimed it would invest in YRIV's port deal.  (Note here that in the WhatsApp message
set out above that was dictated by the Chairman, the Chairman claimed that if the US $10 million
did not arrive timely, there would be no need for it as the deal would fall through. *See* Exhibit 19.)

That is not what happened.  Instead, the TD Bank statement for the account controlled by
Messrs. Sin and Coleman and referenced by FINRA shows receipt of the US $10 million dollars
by FDL from PFS on August 31, 2018.  *See* TD Bank Statements, a true and correct copy of which
is appended hereto as **Exhibit 23**; *see also* Nevada Tr. Excerpt, Day 3, pp. 221-225, a true and
correct copy of which is appended hereto as **Exhibit 24**.  Mr. Sin testified at the Cayman Islands
trial that the US $10 million FDL obtained from PFS was sent to Mr. He, who purportedly was the
then current owner of FDL.  (Again, not according to the Cayman Islands judge.)  *See* Exhibit 25
at pp. 116-18**.**  However, FDL's TD Bank statement produced by FDL in Nevada shows the US
$10 million was actually sent not to Mr. He (or Chen, who according to the Cayman Islands judge
was then the owner of FDL), but, instead, to Ricofeliz Investment Limited ("Ricofeliz") on
September 4, 2018, four days after it was received from PFS and a day before YRIV announced
that the port deal fell through.  In his Nevada trial testimony, Mr. Sin was forced to admit that
Ricofeliz was a subsidiary of YRIV.  *See* Exhibit 24.  Moreover, an additional sum of
approximately US $165,000 owed by Canterbury to FDL for a prior, unrelated trade (recall that
FDL did some trading through Canterbury prior to the PFS deal) was also forwarded to Ricofeliz
on September 4, 2018.  In other words, Mr. Sin lied to the Cayman Islands court.  He lied because
the US $10 million payment to YRIV is further evidence that FDL was an instrumentality of YRIV
to operate a pump-and-dump fraud directed from China using YRIV stock.  All one has to do, as
the old saw goes, is follow the money.

F.    **In Addition to Market Manipulation, the Evidence Shows that YRIV Used FDL to Sell Unregistered YRIV Securities in Violation of Section 5 of the Securities Act of 1933.**

FDL's YRIV stock was acquired in a private transaction from YRIV and was unregistered and restricted when FDL acquired it.  FDL's YRIV stock could not have been sold to the public or used to secure financing unless it either became registered or met an exemption from registration.  On December 6, 2017, apparently in anticipation of the transactions that were about to take place in 2018, FDL procured a letter from a Matthew C. McMurdo, Esq., of McMurdoLaw Group, LLC, opining that the 16.6 million shares of YRIV held by FDL were freely tradable because they met an exemption from registration under Rule 144 of the Securities Act of 1933. *See* Dec. 6, 2017 McMurdo Letter (the "FDL 144 Opinion"), a true and correct copy of which is appended hereto as **Exhibit 26**.  Based on his analysis—which relied largely on representations made to him by FDL—Mr. McMurdo said the following, in relevant part, in the letter addressed to YRIV's transfer agent, VStock:

> [FDL] is not a director, executive officer or 10% shareholder of the Company nor has he been one for at least the preceding 90 days; the Shareholder is not an "affiliate" of the Company;
>
> The Shareholder may rely on Rule 144 as a safe harbor from the definition of "underwriter" as that term is defined in Section 2(a) of the Securities Act;
>
> …
>
> The sale of the shares by [FDL] is exempt from registration under the Securities Act pursuant to Section 4(a)(1) of the Securities Act, and Rule 144(b) thereunder, and may be sold without registration.

**Exhibit 26.**  He then approved the reissuance of the relevant stock certificates without the "restricted" legend on them, rendering them freely tradable.  Critically, for the instruction to the transfer agent and FDL's brokerage firm to remove the restricted legend and allow for free trading

of FDL's YRIV shares, the FDL 144 Opinion relied on the representation from YRIV that FDL was not an "affiliate" of YRIV.

The problem with the FDL 144 Opinion and instruction is that, as proven by the evidence detailed above, FDL was an instrumentality of YRIV for selling unregistered securities in violation of Section 5 of the Securities Act of 1933, 15 U.S.C § 77e. Section 5 of the Securities Act provides that securities must be registered with the SEC before they may be sold by any person. *SEC v. Kern*, 425 F.3d 143, 147 (2d Cir. 2005) (citing 15 U.S.C § 77e). Section 4(1) of the Securities Act, on which the FDL 144 Opinion relied, exempts from the registration requirement "transactions by any person who is not an issuer, underwriter, or dealer". 15 U.S.C § 77d(1). "An underwriter is defined in relevant part in [Section 2(a)(11)] as 'any person who has purchased from an issuer with a view to, *or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking,* or participates or has a participation in the direct or indirect underwriting of any such undertaking.'" *Kern*, at 147-48 (quoting 15 U.S.C.§ 77b(a)(11) (emphasis added). "For purposes of the underwriter definition only, an issuer includes any person controlling, controlled by, or under common control with the issuer of the securities." *Id*. at 148 (citing 15 U.S.C. 77b(a)(11). Further,

> the Commission has limited the definition of "underwriter" to exclude any person who meets the requirements of the Rule 144 safe harbor. [15 U.S.C. § 230.144(b)]. This consequence is precisely limited to its terms. A person who fails to comply with Rule 144 does not benefit from the safe harbor, but can still avoid underwriter status if he does not meet the statutory definition of an underwriter. 15 U.S.C. § 230.144(j). Similarly, a person who complies with Rule 144 must still show that he is neither an issuer nor a dealer to qualify for the 4(1) exemption.

*Kern* at 148.

Here, as discussed, FDL was taking direction from YRIV in its dealings with Canterbury and PFS. Mr. Sin took dictation from the Chairman of YRIV in communicating with Canterbury.

The Chairman threatened to take back the 6 million shares of YRIV that FDL deposited with
Canterbury.  Mr. Coleman was listed as having trading authority in an FDL brokerage account at
White Sands which was to receive FDL's YRIV shares.  Mr. Coleman had access to FDL's TD
Bank account.  In fact, having seen and heard all of the evidence in the Cayman Islands trial about
the relationship between FDL and YRIV, *the Cayman Islands Judge suggested that Ms. Winczura
should have called Mr. Coleman—YRIV's director!—before she began selling the YRIV Collateral
Shares on December 6, 2018 in response to the Hindenburg Report.*[5]  By their own admission,
Mr. Sin and Mr. Coleman (who was a director of YRIV and YRIV's U.S. representative) were
exposed to insider information about YRIV's efforts in connection with its purported port
acquisition.  And last, but *most critically*, both the US $10 million from PFS and the US $165,000
that Canterbury owed to FDL from a prior transaction were sent to a YRIV subsidiary, after the
purported port deal fell through; these sums were not kept by FDL.  It is impossible to escape the
conclusion that FDL was an underwriter within the meaning of Section 5 of the Securities Act
because it "offer[ed] or [sold] for [YRIV] in connection with, the distribution of [YRIV shares],
or participate[d] or ha[d] a direct or indirect participation in any such undertaking…" and because
it was "controlling, controlled by, or under common control with the issuer of the securities."  *See*
15 U.S.C. 77b(a)(11)

---

[5] This statement by the Cayman Islands court shows without doubt that he paid no attention to
Canterbury's argument or simply failed to appreciate that the evidence at trial established that FDL
was an affiliate of YRIV and what that meant.  Despite substantial briefing, he did not address the
issue of selling control/unregistered securities anywhere in his judgment. *See* Exhibit 5.  In fact,
Ms. Winczura may well had violated the federal securities laws if she sought permission from a
company insider to sell shares of that same company on behalf of another ostensibly independent
party.  In any event, the failure to even address the violation of Rule 144 in the Cayman Islands
judgment displays indifference to compliance with U.S. securities laws, much like the back-handed
dismissal of FINRA and its findings displays indifference to the U.S. securities regulation and
enforcement structures.

The Rule 144 exemption for affiliates does not save FDL.  For the reasons set forth above, FDL was a YRIV affiliate under Rule 144.  *See* 17 CFR § 230.144(a)(1) ("An affiliate of an issuer is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer").  Affiliates may be exempt from being deemed underwriters but only if they meet all of the conditions of Rule 144. *See* 17 CFR § 230.144(b)(2). Among those conditions is the limitation on the amount of securities sold, to wit, in relevant part:

(e) *Limitation on amount of securities sold.* Except as hereinafter provided, the amount of securities sold for the account of an affiliate of the issuer in reliance upon this section shall be determined as follows:

(1) If any securities are sold for the account of an affiliate of the issuer, regardless of whether those securities are restricted, the amount of securities sold, together with all sales of securities of the same class sold for the account of such person within the preceding three months, shall not exceed the greatest of:

   (i)  One percent of the shares or other units of the class outstanding as shown by the most recent report or statement published by the issuer, or

   (ii) The average weekly reported volume of trading in such securities on all national securities exchanges and/or reported through the automated quotation system of a registered securities association during the four calendar weeks preceding the filing of notice required by paragraph (h) [requiring notice to the Commission of sales in excess of 5,000 shares or for an aggregate sale price over $50,000, see 17 CFR § 230.144(h)(1)], or if no such notice is required the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker.  17 CFR § 230.144(e).

FDL's 16,600,000 shares of YRIV stock—all deemed freely tradable by the FDL 144 Opinion—represented just under 10% of all issued and outstanding shares of YRIV.  According to the trading data, in 2018, in the weeks before mid-August when the PFS transaction was consummated, YRIV's weekly volume ranged from a high of 1,105,525 on July 30 and a low of 323,131 on August 13, 2018.[6]  As an affiliate, in other words, FDL could not have sold over

---

[6] https://finance.yahoo.com/quote/YRIV/history/?period1=1299853800&period2=1735679130

1.1 million shares of YRIV to PFS and (at the same time) hypothecated over 4 million shares to secure the Put Option, treating all 6,000,000 shares covered by the SPA and the Collateral Shares as freely tradeable.

In sum: the representation that FDL was not an affiliate of YRIV on which the FDL 144 Opinion was based was false. As a YRIV affiliate, to effectuate its agreements with PFS, FDL could not take advantage of the Rule 144 exemption from being considered an underwriter. FDL's sale and hypothecation of its YRIV shares was a sale of unregistered securities for the benefit of YRIV in violation of Section 5 of the Securities Act, 15 U.S.C § 77e.

Simply put, the Foreign Representatives are now using Chapter 15 of the U.S. Bankruptcy Code and this Court to obtain for FDL proceeds from the sale on Nasdaq of unregistered YRIV shares that they misrepresented to Canterbury and PFS as freely tradeable.

**G.    The Cayman Islands Findings of Fiduciary Duty and its Breach Were Based on Testimony Shown to be False.**

FDL asserted two separate bases for its claim of a breach of fiduciary duty in the Cayman Islands proceedings: 1) that the Brokerage Agreement between Canterbury and FDL created a fiduciary duty, and 2) that the manner of introduction of PFS to FDL by Canterbury somehow created a fiduciary duty because Canterbury hid the fact that its close relationship with PFS (both were owned by Ms. Winczura) might have created a conflict of interest. *See* Exhibit 5 at ¶¶ 37-38. The Cayman Islands court rejected the first claim, accepting Canterbury's expert testimony that obligations under a brokerage agreement "would not in normal market practice be viewed as being fiduciary in character." *See id.* ¶ 40. Nonetheless, the Cayman Islands court found both a duty and a breach from the manner of introduction of PFS to FDL by Canterbury. *See id.* ¶ 61.

But those findings were obtained by fraud on the Cayman Islands court; namely, the false testimony of Mr. Sin that prior to entering into the transaction with PFS, FDL believed that PFS

was an arm's-length third party unrelated to Canterbury and that FDL was unaware of the

connection between PFS and Canterbury.  Among other things, Mr. Sin claimed that he did not

know the last name of Mr. Brian Johnston (the manager of PFS) and that he did not know that

Mr. Johnston and Ms. Winczura had a close relationship.  *See id.* ¶¶ 49-52.

Ms. Winczura testified that she disclosed the relationship between PFS and Canterbury to

Mr. Coleman during a telephone call on August 13, 2018, before the transaction with PFS was

completed.  *See id.*  Mr. Sin "firmly rejected" this testimony, according to the Cayman Islands

court.  Mr. Sin claimed that:

> On or about 3 October 2018, FDL discovered the undisclosed relationship that
> existed between Canterbury and PFS by way of searches conducted via the Internet.
> A copy of the searches is exhibited at page 904.  FDL previously did not conduct
> any due diligence on PFS prior to entering into the SPA because it trusted
> Ms. Winczura and believed the representations that had been made to it by her.

*Id.*  Despite finding that Mr. Sin lied repeatedly in both the preliminary AML hearings and at trial,

and that Mr. Sin had produced fake documents to the Cayman Islands court in both the AML

hearings and at the trial on the merits, the Cayman Islands court nonetheless credited Mr. Sin's

testimony that he knew nothing about the relationship between Canterbury and PFS until October

3, 2018.  The Cayman Islands court then posed the legal question this way:

> The critical question is ultimately what legal principles govern the determination
> of when fiduciary duties arise in the context of a service provider which positively
> represents that they are playing an independent role.

*Id.*  The court answered this question thus, in relevant part:

> Accepting entirely that there is a need for caution and restraint about importing
> equitable obligations into contractual commercial relationships, I find that
> Canterbury did owe fiduciary duties to FDL which obliged it to disclose that PFS
> was a closely connected entity and act in good faith to FDL with a view to
> mitigating any relevant conflicts of interests…

> Canterbury owed a fiduciary duty to FDL to (1) disclose the conflict of interest
> which existed between its obligation to act in good faith towards FDL and its own
> personal interests as a party closely connected to FDL's counterparty, PFS (2) act

> in good faith to mitigate the conflict when required to act in any circumstances
> where the commercial interests of PFS and FDL were opposed.

*Id.* ¶ 61.  In other words, according to the Cayman Islands court, FDL needed extra protection

because of an undisclosed conflict.  And that need for extra protection gave rise to:  (i) a finding

of a fiduciary duty, and (ii) its breach.  Of course, that is absurd and circular.  A failure to disclose

a conflict is only a breach of fiduciary duty if that duty already exists.  Otherwise, a failure to

disclose may lead to liability for fraud, or, under some circumstances, a breach of contract.  But

unless someone undertakes to act as a fiduciary (even implicitly), one would not owe a duty of

loyalty or a duty of care to a third party.

As noted, Mr. Coleman did not testify in the Cayman Islands proceeding, but he did in

Nevada.  Unlike Mr. Sin who claimed in the Cayman Islands trial that:  (i) FDL did not discover

the relationship between PFS and Canterbury until October 3, 2018, and (ii) FDL did no due

diligence before the deal was consummated, Mr. Coleman actually admitted at trial in Nevada that

he knew Mr. Johnston's full name and had information on PFS by August 15 or 16, 2018 and no

later than August 20, 2018—*before* the Agreement between FDL and PFS for the sale of FDL's

YRIV shares to PFS was signed.  Mr. Coleman further testified that the only due diligence he did

on Canterbury was to review Canterbury's website.  *See* Exhibit 10 at pp. 26-35 (Exs. 2 & 3 to

Exhibit 10 appended hereto).  That is the same website on which Mr. Johnston was identified as

Canterbury Group's chief operating officer and chief compliance officer.  *See id.* at pp. 36-39 (Ex.

4 to Exhibit 10 appended hereto).  Mr. Coleman testified that he did no due diligence on PFS as

he was only concerned with obtaining the sales proceeds from PFS.  *See id.* at pp. 40-43 (Ex. 5 to

Exhibit 10 appended hereto).

Several things follow from Mr. Coleman's testimony:    *First*, as the Foreign

Representatives know, Mr. Sin lied in the Cayman Islands proceedings and through false testimony

obtained a finding of fiduciary duty (and its breach). *Second*, although he did not testify that Ms. Winczura directly disclosed the relationship with PFS to him, Mr. Coleman's testimony in Nevada supports Ms. Winczura's testimony in the Cayman Islands proceeding, that Mr. Coleman knew of the relationship between Canterbury and PFS. *Third*, in any event, FDL knew about the close relationship between PFS and Canterbury and did not care; FDL never expected Canterbury to act as FDL's fiduciary. Contrary to what the Cayman Islands court may have imagined, FDL did not need or want additional protection; it knew exactly what it was doing. It was placing YRIV shares in the hands of a party (Canterbury) to hold as collateral for the benefit of a related party (PFS). Plainly, FDL had not anticipated the release of the Hindenburg Report; and FDL was confident that it would be able to maintain YRIV's share price at a level and for the length of time necessary to have PFS's Put Option expire out of the money.

Had the Cayman Islands court not been deceived, it would have come to the conclusion that Canterbury could not have been a fiduciary and that, in any event, FDL consented to and waived any potential "conflict." The Foreign Representatives decided to run with the Cayman Islands judgment, fraudulently obtained. But they should have appealed from that decision (or otherwise informed the Cayman Islands trial court), either on behalf of Canterbury or as officers of the Cayman Islands court, in light of the evidence given by FDL in Nevada.

**H.    The Cayman Islands Court's Measure for Breach of Contract Damages, and for Default Damages Against Non-Debtors, was Unfounded and Uninformed.**

As discussed above, immediately after concluding the transaction with PFS in August of 2018, FDL demanded first that the YRIV shares held as collateral be moved to VStock, its transfer agent. (Recall that Mr. Sin and Mr. Coleman both testified about efforts by YRIV and its insiders to keep shares out of the market and that holding shares with and moving YRIV shares to VStock was one of the ways to do so.) Next, FDL claimed that PFS had waived the Put Option and that,

therefore, all YRIV shares held as collateral by Canterbury were to be returned.  This was reflected in a series of letters from FDL to Canterbury dated September 19 and October 24 and 26, 2018. In those letters, FDL purported to rescind what it claimed were its "instructions" to Canterbury to hold its shares as collateral for the Put Option.

PFS then went to court in Nevada to protect its collateral and obtained the Nevada TRO restraining FDL from moving the Collateral Shares and requiring FDL to rescind its "instructions" to Canterbury.  As noted above, the Nevada TRO was converted to the Nevada Injunction, which is still in place.  *See* Exhibit 1.  After FDL refused to honor the Put Option, PFS amended its complaint in the Nevada litigation to enforce its rights under the Put Option.  A trial was held on December 4-7, 2023 and the Nevada court's decision is still pending.

Despite the Nevada Injunction and PFS's perfected security interests in the Collateral Shares—and having agreed that the resolution of the validity of the Put Option and PFS's rights under it were to be decided in Nevada—the Cayman Islands court came to the conclusion that PFS was somehow overcollateralized and that, therefore, Canterbury was required to return to FDL a portion of the collateral that, according to the Cayman Islands court was not needed to secure the Put Option.  (Note that at no time during the October letter writing campaign for the return of the Collateral Shares did FDL claim that PFS was over collateralized; they wanted all shares returned.)

The Cayman Islands court found that the return of the Collateral Shares should have taken place after FDL made its demand for their return and before the Nevada court issued the Nevada TRO.  *See* Exhibit 8 at ¶ 45.  The Cayman Islands court then decided that Canterbury owed FDL half of the cash value of 45% of the shares of YRIV held by Canterbury as collateral for the Put Option.  *See* Exhibit 5 at ¶ 167; *see also* Exhibit 8 at ¶ 48.  The Cayman Islands court calculated those contract damages to be $14,375,336.58 plus interest of $1,707,071,22.

This is an astounding finding for several reasons:

1) As shown above, these are damages assessed for failure to return to FDL unregistered, restricted securities that FDL could not sell (and could not legally had sold to PFS or hypothecated to secure the Put Option) without violating Section 5 of the Securities Act.

2) Assessing damages in this way ignores Messrs. Sin's and Coleman's testimony that they and others were "drying up" the float and had an agreement with other major investors to keep their shares out of the market to prop up YRIV stock price. In other words, at a minimum, FDL would not have sold this stock, and its market value was artificially inflated and would have gone to zero after the Hindenburg Report.

3) The Cayman Islands judge took it upon himself to rewrite the contract between the parties; FDL *agreed* to post these shares as collateral to secure the Put Option. He simply decided that, in his view, on the date on which FDL asked for the shares back, they should have been returned because the market value of the collateral in September and October at then prevailing (inflated) prices materially exceeded what was needed to cover the Put Option. Never mind that as is true in every case (as well as here, as reflected in the WhatsApp messages) the number of Collateral Shares was based on the historical prices of the relevant security and YRIV traded as low as US $2.86 as recently as February 9, 2018.
*See* https://finance.yahoo.com/quote/YRIV/history/?period1=1299853800&period2=1735679130&frequency=1d.

4) His assessment of damages was based on his application of the price of YRIV stock as when FDL demanded it back, with a discount that felt right to him but was not based on any solid economic analysis; he just felt that he should apply a 50% discount to the value of 45% of Collateral Shares at prices that prevailed in September and October.

5) His decision flies in the face of his other finding that Canterbury's sale of Collateral Shares on December 6 and 7, 2018 was also a breach of its agreement with FDL because under his interpretation of that agreement, Canterbury had to give FDL five days' notice before it could liquidate the collateral. Had Canterbury done so, it would have needed much more than 45% of the Collateral Shares to secure the Put Option. More specifically, the strike price of the Put Option was US $11.26 per share and the number of shares covered by the Put Option was 1,144,584. This implies needing to clear US $12,888,015.44 to cover the Put Option if Canterbury had to sell shares to do so. Assuming Canterbury gave notice to FDL on December 6, it could have sold Collateral Shares on December 12 (if one counted December 6 as day 1) or December 13 (if day 1 were to be December 7). On December 12, YRIV closed at $4.86. It closed at $4.03 on the December 13. The number of Collateral Shares held by Canterbury was 4,855,416. At $4.86, to cover the Put Option, Canterbury would have had to sell approximately 2,651,855 shares, or approximately 55% of the Collateral Shares. On December 13, Canterbury would have had to sell approximately 3,198,019 shares, or approximately 66% of the Collateral Shares to clear US $12,888,015.44. Note that on December 12 the total volume of YRIV shares traded that day was 1,570,638. On

51

December 13, the total volume was 1,200,398.  What this volume implies is that if Canterbury dumped 2.5 or 3.5 million shares into the market, the price of YRIV stock on those days would plummet, meaning more Collateral Shares would have had to have been sold to clear US $12,888,015.44.  In other words, much more than 55% or 65% of YRIV collateral shares would have needed to be sold.  Most likely *all* of the Collateral Shares would have had to have been liquidated to cover the Put Option at any time after December 12.  Indeed, there may not have been enough shares to cover the Put Option because the break-even price for all the shares to cover the Put Option was $2.65.

Again, the point here is not that Cayman Islands court got it wrong; it did, but that is not the issue.  The issue is that, knowing everything recounted here, the Foreign Representatives nonetheless decided not to appeal from this obviously erroneous measure of damages, choosing instead to use it opportunistically for the benefit of FDL.

This made-up measure of damages is also relevant, of course, to the US $30-million-dollar pot of gold the Foreign Representatives are now chasing, by pursuing enforcement of the default judgment against the non-debtors.  That measure, obtained by default under the circumstances recounted above, has two components: (i) liability for (unwittingly by Canterbury) selling artificially inflated, restricted, and unregistered YRIV shares in reaction to the Hindenburg Report, and (ii) liability for retaining a made-up sum representing the value of a portion of artificially inflated, restricted, and unregistered YRIV shares that were purportedly improperly retained by Canterbury.  As they know, this erroneous ruling guarantees that FDL receives millions (should the Foreign Representatives succeed in their efforts) even if the Nevada Court finds in favor of PFS.

This US $30 million measure of harm is the basis on which the Foreign Representatives obtained the Freezing Order, as a result of which they were able to obtain the default judgments against Ms. Winczura, Canterbury Group, and PFS.  Moreover, the US $30 million default judgments were then also used to put Canterbury Group and PFS into involuntary liquidation and Ms. Winczura into involuntary bankruptcy in the Cayman Islands.  The Foreign Representatives

have already executed the default judgment against Ms. Winczura's residence in the Cayman Islands. This has been undertaken for the benefit of people who defrauded American capital markets, sold unregistered securities without an exemption, violated anti-money-laundering laws, and procured a judgment in the Cayman Islands on a foundation of outright lies. It is worth noting here, that PFS and Canterbury were not the only victims of YRIV's pump-and-dump. It appears that Interactive Brokers—a major U.S. broker/dealer—lost some US $42 million because of lending against YRIV stock.[7]

To sum up: FDL (really YRIV) has already obtained US $10 million from PFS and, should the Foreign Representatives be successful in their efforts, FDL (really YRIV) will collect another approximately US $30 million for an inarguably successful (at this point) scheme to inflate the value of YRIV shares and sell (through unwitting third parties) unregistered, restricted shares at inflated prices. (And this does not even take into account Interactive Broker's US $42 million loss.) This cannot be what Chapter 15 of the United States Bankruptcy Code was designed to accomplish. Rather, this is exactly what Section 1506 of Chapter 15 was meant to prevent; it gives the Court the discretion to decline comity to the foreign court here so as to decline to help fraudsters who have used foreign courts and foreign procedural tricks to help wrongdoers violate United States securities and anti-money-laundering laws.

## V. __CONCLUSION__

For the foregoing reasons, the Court should dismiss this Chapter 15 proceeding pursuant to 11 U.S.C. § 1506, or in the alternative, terminate the related relief granted to the Foreign Representatives, including the enforcement in the United States of the Cayman Island's freezing

---

[7] *See* https://www.bloomberg.com/news/articles/2019-04-29/china-firm-s-plunge-is-said-to-cost-interactive-brokers-millions

order against non-debtors, and the third-party discovery targeting the assets and affairs of the non-debtors, including the Movant, Canterbury PFS. In addition, pending resolution of this motion, for the reasons set out above, the Court should stay the effect of the freezing order approved by the Court alongside the recognition order and should stay compliance with the subpoenas the Court authorized by approving the Foreign Representatives' request for non-automatic, related relief.

New York, New York
January 7, 2025

Respectfully submitted,

By: /s/ Alex Lipman
Alex Lipman, Esq.
Email: alexlipman@lipmanpllc.com

LIPMAN LAW PLLC
147 West 25th Street
12th Floor
New York, New York 10001
Tel: (212) 401-0070
Cell: (917) 757-9850

**<u>Certificate of Service</u>**

I, Alex Lipman, Esq., upon my oath according to law, hereby certify that on January 7, 2025, I caused to be served a copy of the Motion to Dismiss Chapter 15 Proceeding or, In the Alternative, to Terminate Relief Granted to Foreign Representatives via ECF filing, upon the following:

>Klestadt Winters Jureller
>Southard & Stevens, LLP
>John E. Jureller, Jr.
>200 West 41st Street, 17th Floor
>New York, NY 10036
>Telephone: (212) 972-3000

Dated:   January 7, 2025
         New York, New York

>  /s/   Alex Lipman
>Alex Lipman, Esq.
>Email: alexlipman@lipmanpllc.com
>
>LIPMAN LAW PLLC
>147 West 25th Street
>12th Floor
>New York, New York 10001
>Tel: (212) 401-0070
>Cell: (917) 757-9850